## THE CHICAGO UNION TRACTION COMPANY

*v.*

## THE CITY OF CHICAGO.*

*Opinion filed October 25, 1902—Rehearing denied December 16, 1902.*

1. STREET RAILWAYS—*street railways are within clause 42, section 1, article 5, of City and Village act.* Street railways come within the purview and meaning of clause 42 of section 1 of article 5 of the City and Village act, empowering cities and villages to "license, tax and regulate hackmen, draymen, omnibus drivers, carters, cabmen, porters, expressmen, *and all others pursuing like occupations*, and to prescribe their compensation."

2. SAME—*city of Chicago had power to pass ordinance requiring transfers.* As a question of power, simply, the common council of the city of Chicago was authorized to enact the ordinance of June 26, 1890, (subsequently re-enacted in 1897 as sections 1723 and 1725 of the Revised Code,) which provides that the maximum rate of fare for one continuous passage on any line of a street railway company for any distance within the city limits shall be five cents, and that transfers shall be given where any such line connects with or comes within two hundred feet of any other line owned, leased or operated by the same company.

3. SAME—*power to fix fare includes power to provide for transfers.* The power of a city to fix the maximum rate of fare to be charged by a street railway company includes the power to fix the rate for carrying a passenger over two or more lines operated by one company as well as over one line, the question being, not as to the reasonableness of the charge, but as to the power to fix the charge.

4. SAME—*section 1723 of the Revised Code of Chicago is not in violation of the constitution.* The enactment of section 1723 of the Revised Code of Chicago, as made in 1897, was a valid and lawful exercise of the city's power to regulate street railway fares and transfers, and does not violate any provision of the constitution of the State.

5. SAME—*applicability of section 1723 of the Revised Code of Chicago.* Section 1723 of the Revised Code of Chicago of 1897 applies where a person, firm or corporation has subsequently become and still is the owner or lessee of or is operating two or more lines of street railway within the city of Chicago which join, connect, cross or come within two hundred feet of each other, notwithstanding such lines were before operated by separate persons or companies.

6. SAME—*when lessee of a street railway must operate it under its own charter.* If a corporation is organized under the general Incorpo-

*With this case are decided two other cases of the same title, being Nos. 2653 and 2657.

ration act for the purpose of leasing street railways and operating the same, it must operate them under its own charter and subject to the provision of section 9 of the Incorporation act, requiring obedience to reasonable regulation by the General Assembly, and cannot claim the benefit of any contract or privilege possessed by its lessor which is in violation of its own charter.

7. SAME—*corporation operating street railway under lease must submit to reasonable regulation as to fares.* A corporation organized under the general Incorporation act for the purpose of leasing street railways and operating the same, must, in its business of operating such railways, submit to reasonable regulations by the common council as to its rate of fare.

APPEAL from the Criminal Court of Cook county; the Hon. FARLIN Q. BALL, Judge, presiding.

Eleven actions were commenced by appellee, the city of Chicago, against appellant, the Chicago Union Traction Company, before a justice of the peace of the city of Chicago in December, 1901, to recover penalties for the refusal by appellant to give to passengers on certain of its street car lines transfer tickets, entitling such passengers to rides upon certain other of its street car lines. The first of these actions was to recover a penalty for the refusal by appellant to give to a passenger on its North Clark street car line, running and operated in the north division of the city of Chicago, a transfer ticket, entitling such passenger to a ride upon its Madison street car line, running and operated in the west division of the city of Chicago. The second of these actions was brought to recover a penalty for the refusal by appellant to give to a passenger on its Madison street car line, running and operated in the west division of the city of Chicago, a transfer ticket, entitling such passenger to a ride upon its North Clark street car line, running and operated in the north division of the city. The third of these actions was brought to recover a penalty for the refusal by appellant to give to a passenger on its VanBuren street car line a transfer ticket, entitling such passenger to a ride upon its Halsted street car line, both of said last named

car lines, one on VanBuren and the other on Halsted street, running and being operated in the west division of the city of Chicago. It is conceded that the street car lines, thus running upon the north and west sides, involved in the three actions thus named, are operated by the appellant, the Chicago Union Traction Company. These three actions, involving principally questions of law and not questions of fact, were taken by this court at the June term, 1902, under one agenda number. They involve substantially the same questions, and are considered together as though they were one case. The other eight actions relate to transfer tickets from and to other lines than those already mentioned, alleged by the appellee to be operated by the appellant, and involve certain disputed questions of fact, not in controversy in the first three cases above named. Accordingly, the eight actions, (excepting and excluding the first three already named,) were taken by the court at the June term under one agenda number as one case, and are hereafter considered separately in another opinion.

All the actions are based upon sections 1723 and 1725 of the Revised Code of Chicago, passed by the common council of that city on April 8, 1897, being a mere re-enactment of an ordinance, passed by said council on June 26, 1890. They have been brought for the purpose of testing the question as to the liability of appellant for refusing such transfers. In each of the three actions first above named judgment was entered by the justice against appellant for $50.00 and costs, and from each of said judgments appeals were duly prayed and perfected to the criminal court of Cook county.

In the criminal court of Cook county jury was waived by agreement, and the causes were submitted to the court for trial on February 10, 1902. On March 19, 1902, the court found the appellant, defendant below, guilty in each of the three cases. In each case on April 7, 1902, judgment was rendered against appellant for $50.00 and

costs, to which appellant then and there excepted. The present appeals are prosecuted from the three judgments,· thus entered by the criminal court of Cook county, to this court.

Section 1723 is as follows: "The rate of fare to be charged by any person, firm, company or corporation owning, leasing, running or operating street cars or other vehicles for the conveyance of passengers ·on any street railway within the limits of the city of Chicago for any distance within the city limits, shall not exceed five cents for each passenger over twelve years of age, and half fare for each passenger over seven and under twelve years of age, for one continuous trip, except when such street cars or other vehicles shall be chartered for a specific purpose. And, at any point where any line of any street railway owned, leased or operated by any person, firm or corporation does now or shall hereafter, within the limits of the city of Chicago, join, connect with, cross, intersect or come within a distance of two hundred feet of any other line of street railway owned, leased or operated by the same person, firm, company or corporation, any passenger who shall have paid his fare on any street car or other vehicles run or operated on such first mentioned line shall, on his request, be entitled to demand and receive from the person or persons in charge of such street car or other vehicle upon which he has so paid his fare, a transfer ticket, which transfer ticket shall entitle such passenger, without further charge, to be carried on any other one line adjoining, connecting, crossing and intersecting, as aforesaid, and owned, leased or operated by such person, firm or corporation, for a continuous trip of any distance within the limits of the city of Chicago, if used within one hour after the same is issued at the point or place for which such transfer ticket was issued."

Section 1725 is as follows: "For each and every violation of the provisions of the two last preceding sections, the person, firm, company or corporation owning,

leasing or operating said street cars or other vehicles within said city shall be subject to a penalty of not less than $50.00, nor more than $200.00." (1 Rev. Code of Chicago of 1897, pp. 363, 364).

On August 16, 1858, the common council of the city of Chicago passed an ordinance entitled, "An ordinance authorizing the construction and operation of certain horse railways in the streets of the city of Chicago." By section 1 of this ordinance "there is hereby granted to Henry Fuller, Franklin Parmelee and Liberty Bigelow, and such other persons as may hereafter become associated with them, and to their executors, administrators and assigns, permission, authority and consent of the common council to lay a single or double track for a railway, with all necessary and convenient tracks for turn-outs, side-tracks and switches, in and along the course of certain streets in the city of Chicago hereinafter mentioned, and to operate railway cars and carriages thereon in the manner, and for the time and upon the conditions hereinafter prescribed: *Provided*, that said tracks shall not be laid within twelve feet of the sidewalks upon any of the streets." By section 2 of the ordinance said parties are authorized to lay a single or double track for a railway in and along the course of certain streets therein named, some of them being in the south division of the city of Chicago, and others being in the west division of the city of Chicago. By section 4 it is provided, that the common council shall have power at all times to make such regulations as to the rate of speed and time of running said cars or carriages as the public safety and convenience may require. Section 6 of said ordinance is as follows: "The rate of fare for any distance shall not exceed five cents, except when cars or carriages shall be chartered for a specific purpose." By section 7 it was provided that said parties, their associates and successors should pay one-third of the cost of paving, etc., the streets on which said railways should be constructed,

and should keep parts of the streets in good repair and condition,.etc.   By section 9 it was provided as follows: "If the said parties, their associates or successors, shall hereafter become incorporated, the rights and privileges granted to them by virtue of this ordinance shall extend to such corporation for the time and upon the conditions herein prescribed, and when such act of incorporation shall have been obtained, such corporation shall have all the rights and privileges hereby granted, as the successors of said parties without further action of the common council." By section 10 it was provided that "the right to operate said railways shall extend to the full time of twenty-five years from the passage hereof," etc.

Sections 3 and 8 of the ordinance of August 16, 1858, may be found in volume 2 of the Special Ordinances of Chicago of 1898 on pages 1042, 1043 and 1044.   Section 3 provides that the cars to be used upon the tracks shall be operated with animal power only, and that said railways shall not connect with any other railroad on which other power is used, and no railway car or carriage, used upon any other railroad in this State, shall be used· or passed upon said tracks.   Section 8 provides that the rights and privileges granted to said parties shall be forfeited, unless said railways shall be commenced and completed within a certain time, etc.

On February 14, 1859, the legislature passed an act entitled, "An act to promote the construction of horse railways in the city of Chicago."   By section 1 of this act it is provided "that Franklin Parmelee, Liberty Bigelow, Henry Fuller and David A. Gage, and their successors, be, and they are hereby created and constituted a body corporate and politic, by the name of 'The Chicago City Railway Company,' for the term of twenty-five years, with all the powers and authority incident to corporations, for the purposes hereinafter mentioned." Section 2 of said act is as follows: "The said corporation is hereby authorized and empowered to construct, maintain

and operate a single or double track railway, with all
necessary and convenient tracks for turn-outs, side-tracks
and appendages, in the city of Chicago, and in, on, over
and along such street or streets, highway or highways,
bridge or bridges, river or rivers, within the present or
future limits of the south or west divisions of the city of
Chicago, as the common council of said city have author-
ized said corporators or any of them, or shall authorize
said corporation so to do, in such manner and upon such
terms and conditions, and with such rights and privileges
as the said common council has, or may, by contract
with said parties, or any or either of them, prescribe;
but said corporation shall not be liable for the loss of
any baggage carried on said railways, kept in and under
the care of its owner, his servant or agent." Both par-
ties treat section 2 as using the following words: "In
such manner and upon such terms and conditions, with
such rights and privileges as the said common council
has or may, by contract with said parties, or any or
either of them, prescribe." Section 3 of said act of Feb-
ruary 14, 1859, is as follows: "The capital stock of said
corporation shall be $100,000.00, and may be increased
from time to time at the pleasure of said corporation.
It shall be divided into shares of $100.00 each, and be
issued and transferred in such manner and upon such
conditions as the board of directors of said corporation
may direct." Section 4 is as follows: "All the corporate
powers of said corporation shall be vested in and exer-
cised by a board of directors, and such officers and agents
as said board shall appoint. The first board of direct-
ors shall consist of said Franklin Parmelee, Liberty
Bigelow, Henry Fuller and David A. Gage, and there-
after of not less than three nor more than seven stock-
holders, who shall be chosen each and every year by
the stockholders, at such time and in such manner as the
said corporation shall by its laws prescribe. The said
directors shall hold their offices until their successors

are elected and qualified, and may fill any vacancies which may happen in the board of directors, by death, resignation or otherwise. They may also adopt such by-laws, rules and regulations for the government of said corporation and the management of its affairs and business, as they may think proper, not inconsistent with the laws of this State." Section 5 is as follows: "The said corporation is hereby authorized to extend the said several railways herein authorized to be built in the manner aforesaid to any point or points within the county of Cook in this State; and, to enable said corporation to construct any or all the railways therein authorized, or their appendages, the said corporation is hereby vested with power to take and apply private property for the purposes and in the manner prescribed by an act entitled 'An act to amend the law condemning right of way, for purposes of internal improvement,' approved June 22, 1852, and the several acts amendatory thereof, and may exercise all the powers conferred upon railroad corporations by the twenty-fifth and twenty-sixth sections of 'An act to provide for a general system of railroad incorporations,' approved November 5, 1849, ascertaining and making recompense for all damages sustained, agreeably to the provisions of the act hereinbefore first mentioned."

Section 6 is as follows: "The said corporation is hereby authorized, with the assent of the supervisor of any township, to lay down and maintain the said railway or railways in, upon, over and along any common highway in said township, but in such manner as not to obstruct the common travel of the public over the same. In all cases where vehicles shall meet the cars or carriages of said railway, either in the city or country, said vehicles shall give way to the cars or carriages on the railway." Section 7 is as follows: "All of the rights and privileges granted, or intended so to be, to said Franklin Parmelee, Liberty Bigelow, Henry Fuller and their associates, in

and by the ordinances of the common council and the amendments thereto, are hereby in all things affirmed, and shall pass to and become vested in the corporation hereby created." Section 8 is as follows: "Nothing herein contained shall authorize the construction of more than a single track, with the necessary turn-outs, which shall only be at street crossings upon State street between Madison and Twelfth streets, except by the consent of the owners of two-thirds of the property in lineal measurement, lying upon said State street between Madison and Twelfth streets aforesaid, nor shall anything herein contained be construed to authorize the company hereby incorporated to permit cars of any other railroad company whatever, propelled by steam, to be run along or upon the railway of the company hereby incorporated." Section 9 is as follows: "The said company hereby incorporated shall, within two years from the passage of this act, erect, maintain and operate two railways; one from Lake street to the southern boundary of the city, and one from the south branch of the Chicago river on Madison street, to the western boundary of said city; and upon failure to do so, this act, and all the privileges and franchises hereby conferred shall cease and determine."

Section 10 is as follows: "All the grants, powers, privileges, immunities and franchises conferred upon, and all duties and obligations required of Franklin Parmelee, Liberty Bigelow, Henry Fuller and David A. Gage, by this act, for the south and west divisions of the city of Chicago and the county of Cook, are hereby conferred upon and required of William B. Ogden, John B. Turner, Charles V. Dyer, James H. Rees and Valentine C. Turner, by the name of 'The North Chicago City Railway Company,' for the north division of said city and said county of Cook, as fully and effectually, to all intents and purposes, as if they had been by a separate act, incorporated. with all of said grants, powers, privileges, immunities and franchises, conferred upon them, and all of said du-

ties and obligations imposed upon them; and the said last named corporation may take, hold, mortgage and convey real estate." Section 11 of said act is as follows: "This act shall be deemed a public act, and noticed by all courts as such without pleading, and shall take effect from its passage." (Laws of Ill. 1859, p. 530).

On May 23, 1859, the common council of Chicago passed "An ordinance authorizing the extension and operation of certain horse railways in the streets of the south and west divisions of Chicago." By section 1 of said ordinance it is provided "that under and by virtue of an act of the legislature of the State of Illinois entitled 'An act to promote the construction of horse railways in the city of Chicago,' approved the 14th day of February, A. D. 1859, constituting Franklin Parmelee, Liberty Bigelow, Henry Fuller and David A. Gage, and their successors, a body corporate and politic, by the name of 'The Chicago City Railway Company,' and by virtue of the powers and authority in the said common council otherwise by law vested, consent, permission and authority are hereby unto the said the Chicago City Railway Company, given, granted and duly vested to lay a single or double track for a railway, with all necessary and convenient tracks for turn-outs, side-tracks and switches, in and along the course of the streets and bridges of the south and west divisions of the city of Chicago, hereinafter mentioned; and the same to keep, maintain and use, and to operate thereon railway cars and carriages, during all the term in the said act of the 14th day of February, A. D. 1859, specified and prescribed in the manner and upon the conditions hereinafter prescribed: *Provided*, that said tracks shall not be laid within twelve feet of the sidewalk upon any of the streets hereinafter mentioned, in any case wherein it is practicable to be avoided." By section 2 of said ordinance the company is thereby, as above mentioned, authorized to lay a single or double track for such railways in and

along the course of certain streets therein named, situated in both the south and west divisions of the city of Chicago. Section 7 of said ordinance is as follows: "The rate of fare for any distance shall not exceed five cents, except when cars or carriages shall be chartered for specific purposes." By section 8 of said ordinance said company is required to keep eight feet in width along the line of said railway on streets wherein one track is constructed, and sixteen feet in width along the line of said railway where two tracks are constructed, in good repair and condition during all the time which the privilege thereby granted to said company shall extend, in accordance with whatever order or regulation respecting the ordinary repairs thereof may be passed or adopted by the common council of said city. By section 11, "all the rights and privileges heretofore granted to the said Franklin Parmelee, Liberty Bigelow and Henry Fuller, by an ordinance entitled 'An ordinance authorizing the construction and operation of certain horse railways in the streets of the city of Chicago,' or any amendment thereto, are hereby granted and confirmed to the said the Chicago City Railway Company and its successors." Sections 3, 4, 5, 6, 9, 10 and 12 of said ordinance may be found in volume 2 of Special Ordinances of Chicago, 1898, on pages 1048, 1049 and 1050. Section 3 relates to the time of completion of the railways authorized to be constructed. Section 4 provides that the cars to be used upon said tracks shall be operated with animal power only, etc. Section 5 gives the common council power at all times to make such regulations as to the rate of speed and the time of running said cars or carriages as the public safety and convenience may require. Section 6 relates to the construction of the track. Section 9 provides for forfeiture in case the railways are not completed within the time and according to the conditions mentioned in the ordinance. Section 10 provides that rights vested in the board of water and sewerage com-

missioners shall not be impaired. Section 12 provides for the execution of a bond by the parties above named.

On the same day, May 23, 1859, the common council passed an ordinance entitled, "An ordinance authorizing the construction and operation of horse railways in the north division of the city of Chicago." By section 1 of this ordinance it is provided as follows: "That there is hereby granted to the North Chicago City Railway Company the consent, authority and permission of the common council to lay a single track for a railway, with all necessary and convenient tracks for turn-outs, side-tracks and switches, in and along the course of certain streets in the city of Chicago hereinafter mentioned, and to operate railway cars and carriages thereon in the manner and for the time and upon the conditions hereinafter prescribed: *Provided, however*, that, except in turning street corners, said tracks shall not be laid within twelve feet of the sidewalk upon any of the streets." Section 2 provides that the company is authorized to lay a single or double track for a railway in and along certain streets therein named, located in the north division of the city. Section 6 of said ordinance is as follows: "The rates of fare for any distance within the city limits shall not exceed five cents for each passenger, except when cars and carriages shall be chartered for a specific purpose." Section 7 provides for the improvement of the streets along which the railways shall be built and for keeping certain portions of them in repair, substantially in the same terms as is specified in the other ordinance above set forth passed on the same day. Sections 3, 4, 5, 8, 9, 10 and 11 of said ordinance may be found in volume 2 of Special Ordinances of Chicago of 1898, on pages 1416, 1417 and 1418. Section 3 provides that the cars upon said tracks shall, within the limits of the city, be propelled by animal power only, etc. Section 4 relates to the power of the common council to make regulations as to the rate of speed and the time or times of running cars

or carriages, as the public convenience and safety may require. Section 5 provides for the mode of laying the tracks. Section 8, for the time of completion of the railway. Section 9 relates to the rights vested in the boards of water and sewerage commissioners. Section 10 is as follows: "The rights and privileges granted to the said company by this ordinance, or intended so to be, shall continue and be in force for the benefit of said company for the full term of twenty-five years from the passage of this ordinance, and no longer." Section 11 provides for a bond to be entered into by the North Chicago City Railway Company with the city of Chicago in the penal sum of $25,000.00, etc.

On February 21, 1861, the legislature passed an act entitled "An act to authorize the extension of horse railways in the city of Chicago," which is as follows:

"Section 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That Edward P. Ward, William K. McAllister, Samuel B. Walker, James L. Wilson, Charles B. Brown, Nathaniel P. Wilder and their successors, be and they are hereby created and constituted a body corporate and politic, by the name of 'The Chicago West Division Railway Company,' for the term of twenty-five years, with all the powers and authority pertaining to corporations for like purposes.

"Sec. 2. The said corporation shall possess all the powers conferred by, and be subject to all the provisions contained in, the second, third, fifth and sixth sections of an act, entitled, 'An act to promote the construction of horse railways in the city of Chicago,' approved February 14, 1859: *Provided,* that nothing herein contained shall be so construed as to in any manner invalidate or injuriously affect any of the rights of either of the corporations created by said act, or to authorize the corporation hereby created to construct or use any railway track in the north division of Chicago, except by the written consent of the North Chicago City Railway Com-

pany: *And further provided,* the consent of the owners of two-thirds of the property, by lineal measure, fronting upon the streets through which said railway shall pass, shall be obtained.

"Sec. 3.  All the corporate powers of said corporation shall be vested in and exercised by a board of directors, and such officers and agents as said board shall appoint. The first board of directors shall consist of said Charles B. Brown, James L. Wilson, William K. McAllister, Samuel B. Walker and Nathaniel P. Wilder, and, thereafter, of not less than three nor more than seven stockholders, who shall be chosen each and every year by the stockholders, at such time and in such manner as the said corporation shall, by its laws, prescribe.  The said directors shall hold their offices until their successors are elected and qualified, and may fill any vacancies which may happen in the board of directors, by death, resignation or otherwise.  They may also adopt such by-laws, rules and regulations for the government of said corporation and the management of its affairs and business as they may think proper, not inconsistent with the laws of this State.

"Sec. 4.  The corporation hereby created is authorized to purchase, hold and convey real or personal estate; to mortgage or lease its franchises and property;  to acquire, unite and exercise any of the powers, franchises, privileges or immunities conferred upon the Chicago City Railway Company by the act aforesaid, or any ordinance of the common council of said city, upon such terms and conditions as may by contract between the said railway corporations, be prescribed; and the consent of the board of directors of the said Chicago City Railway Company, manifested in writing, shall be a condition precedent to the corporation hereby created exercising the powers, or any of them, conferred upon it by the second section of the act aforesaid, as to any street of said south and west divisions of Chicago, in which the said Chicago City Railway Company has acquired the right of laying down

its track: *Provided*, that upon obtaining such contract or consent, as aforesaid, this corporation shall thereupon and thereby become entitled, as to the streets last above mentioned and no others, to use the same according to the provisions of said contract and the ordinances aforesaid, anything herein contained to the contrary notwithstanding.

"Sec. 5. If any person shall willfully and maliciously obstruct either of the corporations aforesaid, or that hereby created, in the use of any of their railway tracks, or the passing of the cars of either of said corporations thereon, such person, and all who shall be aiding or abetting, shall be punished by a fine not exceeding $500.00, or may be imprisoned in a common jail for a period not exceeding three months.

"Sec. 6. This act shall be deemed a public act, and noticed by all courts as such, without pleading, and shall take effect from its passage." (Private Laws of Ill. 1861, p. 340.)

An agreement, dated July 29, 1863, was entered into between the Chicago City Railway Company and the Chicago West Division Railway Company, whereby the City Railway Company agreed to sell, convey and assure by good and sufficient deed or deeds to the West Division Railway Company all the property, rights and privileges of the City Railway Company, the several railway tracks, turn-outs and switches of the City Railway Company lying and being upon Randolph street, Madison street, Park street, Southwestern avenue and Lake street in Chicago, together with the franchises, rights, privileges and immunities of the City Railway Company in, to and upon either and all of said streets and the bridges at Madison and Randolph streets across the south branch of the Chicago river, conferred, given or granted to the City Railway Company under any and all acts of the General Assembly of the State of Illinois, and any and all ordinances of the city of Chicago or contracts with the com-

mon council of said city; also all the rolling stock; also the right, privilege and franchise of laying down, constructing, maintaining and operating railway tracks in, upon and along certain streets named in the west division of the city, and also the right of using, free of charge, the railway track of the City railway on State street from the intersection of the Madison street railway therewith northerly to Lake street.

A deed, dated July 30, 1863, was executed by the Chicago City Railway Company to the Chicago West Division Railway Company, conveying to the latter the property, privileges and franchises set forth and described in the contract last referred to.

On February 6, 1865, the legislature of Illinois passed an act entitled "An act concerning horse railways in the city of Chicago," which said act was passed over veto. This act of 1865 purported to amend the first sections of the acts of 1859 and 1861 hereinbefore set out by changing the term of twenty-five years therein to ninety-nine years. It also purported to amend section 2 of the act of 1859, as expressed in that act and as included in the act of 1861. It also confirmed an ordinance of the common council of Chicago, passed on August 17, 1864, entitled "An ordinance concerning the maintenance and operation of the Chicago and Evanston railroad in the limits of the city of Chicago." The fifth section of the act provided that it should be deemed a public act, etc. (1 Private Laws of Ill. 1865, p. 597).

On November 16, 1863, the common council passed an ordinance entitled "An ordinance for the preservation of certain streets of Chicago from railway uses," which said ordinance provides and declares that no railway track shall be constructed for the period of twenty years along Michigan and Wabash avenues, and other streets, which said ordinance contains the following recital, to-wit: "Whereas also the Chicago West Division Railway Company * * * has acquired by contract with the Chi-

cago City Railway Company all such right to use said streets as was and hereby is granted to said last named company, as aforesaid, as to all the streets in said west division and certain of the streets in the south division of Chicago in said ordinances mentioned."

The lines of the North Chicago City Railway Company were operated as horse railways by that company from 1859 up to about the year 1886, at which time the North Chicago Street Railroad Company was organized, and, as is claimed by the appellant, became the lessee of all of said north side lines under a lease alleged to have been executed to it by the North Chicago City Railway Company. But no such lease was introduced in evidence, or appears in the record.   Since 1886 the North Chicago Street Railroad Company has extended said lines, and built others.

The Chicago West Division Railway Company, from July, 1863, until about 1889, continued to operate as street railways all of the west side lines.   In 1889 the West Chicago Street Railroad Company was organized, and is claimed by appellant to have become the lessee of all of said west side lines under a lease alleged to have been executed to it by the Chicago West Division Railway Company, but no such lease was introduced in evidence, and none appears in the record.   Thereafter, the West Chicago Street Railroad Company built other lines in the west and south divisions of the city.

On May 24, 1899, the appellant, the Chicago Union Traction Company, was organized under the general Incorporation law of this State.   The statement, filed by it in the office of the Secretary of State in accordance with section 2 of the general Incorporation act, recites that "the object for which it is formed is to construct, own, purchase, acquire and lease street railroads in the city of Chicago, and in the counties of Cook, Lake, McHenry, DuPage and Will in the State of Illinois, and to operate the said railroads owned and leased by it with

animal, cable, electric or other power, except steam loco-
motive; and own and enjoy all real and personal property
necessary or proper for the prosecution of the business
aforesaid." The statement also states, that the capital
stock shall be $32,000,000.00; that the amount of each
share is $100.00; that the number of shares are 320,000;
that the location of the principal office is in Chicago,
and that the duration of the corporation shall be ninety-
nine years. The final certificate of appellant's organi-
zation, together with the report of the commissioners,
etc., was filed in the recorder's office of Cook county on
May 25, 1899.

The North Chicago Street Railroad Company contin-
ued to operate the north side lines from 1886 until about
June 1 or July 1, 1899. It is claimed by appellant that,
at the latter date, said north side lines were leased by
the North Chicago Street Railroad Company to the Chi-
cago Union Traction Company, but no such lease was
introduced in evidence, nor is any such lease set out in
the record.

On June 1, 1899, the West Chicago Street Railroad
Company, as party of the first part, thereinafter called
the "Railroad Company," executed a lease to the appel-
lant, the Chicago Union Traction Company, as party of
the second part, thereinafter called the "Traction Com-
pany." This lease recites, that the railroad company was
organized under the laws of Illinois, and has full corpo-
rate capacity to lease railroads in Chicago. It also recites
that the traction company is a corporation organized un-
der the laws of Illinois, and has full corporate capacity
to acquire by lease or otherwise, and thereafter main-
tain and operate, railroads in Chicago, etc. By the terms
of this lease, the said railroad company sells, assigns,
transfers and sets over unto the traction company three
certain agreements between the Chicago West Division
Railway Company and the West Chicago Street Railroad
Company, and between the latter and the Chicago Pas-

senger Railway Company, dated respectively October 20, 1887, November 16, 1888, and March 15, 1889, but these agreements were not introduced in evidence, and do not appear in the record. Said lease, however, of June 1, 1899, recites that the Chicago West Division Railway Company and the said Chicago Passenger Railway Company, respectively, "demise and lease to the said railroad company all and singular their respective railways, owned and operated by the said railway companies, respectively, together with all their respective real, personal and mixed property and their rights and privileges connected with or related to the said demised railways, or any part thereof." The following recital is also made in said lease of June 1, 1899, executed by the West Chicago Street Railroad Company to the Chicago Union Traction Company, to-wit: "Meaning and intending hereby to vest in said traction company all and singular the property, rights, privileges and everything of value, as they are now vested in, and held by, the said railroad company under the said leases respectively, and correspondingly to obligate the said traction company to assume, carry out and perform every condition, obligation and covenant assumed and agreed to be performed and observed by the said railroad company," etc. By the terms of said lease of June 1, 1899, the West Chicago Street Railroad Company "does hereby grant, demise and lease unto the said traction company, its successors and assigns, all and singular, the railways now owned and operated by the said railroad company in the city of Chicago, and in Cook county, Illinois, and as the same may at any time hereafter be located or constructed, * * * together with all appurtenances and property, real, personal, moneys, securities and choses in action belonging to the party of the first part, and all contract and ordinance, rights and privileges connected with or relating to the construction, maintenance and operation of the said demised railways, or any part thereof," etc. It is also

recited in said lease of June 1, 1899, that "the said traction company shall have the right and power to  *  *  * do all other things that an absolute owner can do except to sell and assign" the stock, etc.   In said lease of June 1, 1899, is the following recital: "The said traction company to hold the said properties as fully and entirely as the same now are, or may hereafter be vested in the said railroad company, its successors or assigns, saving and reserving, however, the franchise of being a corporation and every other right or privilege which is or may be necessary to preserve the corporate existence of the said party of the first part."   It is also said in said lease of June 1, 1899, that "the traction company  *  *  *  shall maintain and effectually operate said railways to the extent that it shall have the lawful right so to do."

Since June or July, 1899, appellant has continued to operate all of the west and north side lines.

Upon the trial in the criminal court of Cook county, at the close of the evidence, appellant moved the court that judgment be entered in its favor, upon the alleged ground that sections 1723 and 1725 of the Revised Code of Chicago impaired the obligation of the contract between the city and the appellant, and upon the ground that said sections deprived the defendant of its property without due process of law, and denied to it the equal protection of the laws, the latter ground, however, having more particular reference to the eight actions not here under consideration, but taken as a separate case. The court overruled the motion, and the defendant then and there took exception.

Appellee, the plaintiff below, by its counsel, submitted to the court, and the court held, certain written propositions of law, to the effect that appellant was guilty of a violation of said section 1723; that the city of Chicago was authorized to pass ordinances regulating street railway fares and transfers; that section 1723 was a valid and lawful exercise of the city's powers to regu-

late street railway fares and transfers, and did not vio-
late any provision of the constitution of the State of
Illinois; that said section 1723 applies to cases where
a person, firm or corporation has subsequently become
and still is the owner or lessee of, or has subsequently
assumed the operation of, and is actually engaged in
the operation of, two lines of street railway each within
the city of Chicago, which join, connect, cross, intersect
or come within two hundred feet of each other. To the
holding of these propositions the defendant excepted.

The defendant by its counsel submitted to the court,
and the court refused, certain written propositions of
law, to the effect that said sections 1723 and 1725 were
in contravention of the constitution of the United States
in that they deprived defendant of its property without
due process of law, and denied to it the equal protection
of the laws; that said sections were in contravention of
the constitution of the United States, upon the alleged
ground that they impaired the contract between plaintiff
and defendant, which contract is alleged to have been
in force when said sections were passed, and ever since
that time; that, as matter of law, under the law and the
evidence, the judgment should be for the defendant; that
an act of the legislature approved June 9, 1897, entitled
"An act to amend the title and sections 1 and 3 of an
act entitled 'An act in regard to horse and dummy rail-
roads,'" approved March 19, 1874, repealed so much of
section 1723 as relates to transfers; that the common
council of the city of Chicago had no power, on April 8
or 9, 1897, to pass so much of section 1723 as relates to
transfers, or to require any street railway company then
or thereafter owning, leasing or operating a street rail-
way in said city, to furnish any passenger, who had paid
his fare for riding on any car of such street railway, a
transfer ticket entitling such passenger, without further
charge, to be carried on any other line owned, leased or
operated by such railway company, adjoining, connect-

ing, crossing or intersecting the line, upon which such passenger first took passage, for a continuous trip for any distance within the limits of said city; that so much of section 1723, as relates to transfers, does not apply to two different systems of street railroad lines, which crossed or connected with each other and were built and in operation before and at the time of the passage of said ordinance, but which said systems at the time of the passage of said ordinance, and previous thereto, were severally in the possession of and operated by distinct and independent corporations. To the refusal of these propositions appellant, by its counsel, excepted.

GARNETT & GARNETT, (W. W. GURLEY, of counsel,) for appellant:

Appellee's case rests primarily on clause 42 of section 1, paragraph 63, article 5, of the City and Village act. If the city has power to regulate rates or require transfers the grant is contained in this clause which bestows the power "to license, tax and regulate hackmen, draymen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and to prescribe their compensation." It is urged by the city that a street car company follows a like occupation with hackmen, cabmen and omnibus drivers.

Doubts as to existence of a power are resolved against the municipality. *Emmons* v. *Lewiston,* 132 Ill. 384; *Cairo* v. *Coleman,* 53 Ill. App. 687; *Cairo* v. *Bross,* 101 Ill. 478.

This doctrine is especially pertinent to alleged grants of power to fix rates. *Inter-State Commerce Commission* v. *Railway Co.* 167 U. S. 494.

Where there is an enumeration of specific things, followed by a clause general in its nature, the general words are never held to include things of a higher order than those specifically mentioned. Thus, drivers of stage coaches have been held not to be included in the term "all other persons," when the persons specifically men-

tioned were horse coursers, wagoners, etc. *Sandiman* v. *Breach,* 7 B. & C. 99.

Likewise the words "Humber, Ouse, Trent, and all other waters in the kingdom of Great Britain," were considered not broad enough to include the river Thames. (Dwarris, 656; 2 Inst. cap. 47, p. 478.) And the phrase "all other metals" does not include gold and silver, when the metals enumerated are copper, iron, lead and tin. (*Casher* v. *Holmes,* 2 B. & Ad. 592.) To similar effect see *Ambler* v. *Whipple,* 139 Ill. 317, and *Archbishop of Canterbury's case,* 2 Rep. 46 *a.*

The legislature which passed the City and Village act of 1872 must be presumed to have known that more than forty street railroads had been chartered and were in operation within the various cities of the State. Knowing the existence of these street railroad companies it cannot be said with reason that the legislature intended, in clause 42, to dignify carters, porters and draymen with specific mention and to include the vastly more important street railroads under merely general words. The sole object of statutory construction is to find the legislative intent. *McIntyre* v. *Ingraham,* 35 Miss. 52; *Zarresseller* v. *People,* 17 Ill. 101; *Williams* v. *Ellis,* L. R. 5 Q. B. Div. 175; *Taylor* v. *Goodwin,* 4 Q. B. Div. 228; *Railroad Co.* v. *O'Hara,* 150 Ill. 586; *State* v. *Lang,* 14 Mo. App. 247; *Reed* v. *Ingham,* 3 El. & Bl. 888; *Railroad Co.* v. *Crocker,* 95 Ala. 412; *Thomas* v. *Railroad Co.* 38 Ga. 222.

Clause 42 was substantially like clauses in Chicago's charters of 1851 and 1863. That of 1851 was granted before street railways existed in the State. The charter of 1863 was amended in 1867 so as to give the city express power to direct the price at which passengers should be conveyed on street railroads. The section granting this express power was repealed in 1869. The amendment, however, was made and the repealing act passed while the city had and was allowed to retain, under a clause substantially like clause 42, all the powers that are now

granted by that clause. The legislature could not have intended, therefore, by clause 42, to grant the right to regulate fares charged by street car companies. *Attorney General* v. *Lamplough,* L. R. 3 Exch. Div. 227; Hardcastle on Construction of Statutes, 216, 217; *Ex parte Crow Dog,* 109 U. S. 561; *Bank for Savings* v. *Collector,* 3 Wall. 513.

Unconstitutional and repealed statutes are *in pari materia* with constitutional and existing statutes relating to the same subject matter. *Doe* v. *Avaline,* 8 Ind. 6; *Coffin* v. *Rich,* 45 Me. 507; *Rex* v. *Loxdale,* 1 Burr, 445; *Stribling* v. *Prettyman,* 57 Ill. 375; *Baird* v. *Hutchinson,* 179 id. 435.

The special charters of cities, villages and towns of the State of Illinois granted before 1870 were the prior legislation out of which the general Incorporation act of 1872 was created, and those charters are *in pari materia* with that act. *Cario* v. *Bross,* 101 Ill. 478.

The decision upon which appellee chiefly relies for its construction of clause 42, (*Railway Co.* v. *Philadelphia,* 58 Pa. St. 119,) was rendered by a divided court in 1868. In this case it was held that a street car was in the nature of an omnibus. Judge Drummond, in 1880, followed this decision in *Allerton* v. *Chicago,* 6 Fed. Rep. 555. Judge Blodgett dissented. The *Philadelphia case* has long since been discredited by the court from which it emanated. *Bridge Co.* v. *Railroad Co.* 114 Pa. St. 484.

Not only is it evident that the legislature did not intend to include street car companies in clause 42, but they did not use words which make such a construction possible. Street car companies do not pursue a like occupation with any of the persons described in clause 42, even though the street car, as a vehicle, is in the nature of an omnibus. *Bridge Co.* v. *Railroad Co.* 114 Pa. St. 484; *Lynchburg* v. *Railroad Co.* 80 Va. 237; *Railroad Co.* v. *Bowers,* 4 Houst. 506.

The evils sought to be remedied by clause 42 do not exist in the case of street car companies. *Farwell* v. *Chicago,* 71 Ill. 272.

A power to fix fares to be charged by street car companies and other common carriers does not include, as an incident, the power to require transfer slips. The latter power is much broader than the former. *Trust Co.* v. *Atlanta*, 83 Fed. Rep. 39; *Railway Co.* v. *Smith*, 173 U. S. 690.

Wherever any matter has been the subject of special legislative providence, a subsequent general law will not affect the matter to which the legislature has given special attention. *Railroad Co.* v. *Hoboken*, 41 N. J. L. 71; *Ottawa* v. *LaSalle County*, 12 Ill. 340; *Braceville* v. *Doherty*, 30 Ill. App. 651; *People* v. *Harrison*, 185 Ill. 313; *Ridgeway* v. *Gallatin County*, 181 id. 521; *People* v. *Mount*, 87 Ill. App. 203; *Gunnarssohn* v. *Stirling*, 92 Ill. 573; *Butz* v. *Kerr*, 123 id. 659; *Swigart* v. *People*, 50 Ill. App. 188; *Brown* v. *County Comrs.* 21 Pa. St. 43; Thompson on Corporations, sec. 5679; *McKenna* v. *Edmondstone*, 91 N. Y. 233; *Deters* v. *Renick*, 37 Mo. 598; *Horton* v. *School Comrs.* 43 Ala. 598; *President* v. *Rushville*, 32 Ill. App. 323; *East St. Louis* v. *Maxwell*, 99 Ill. 444; *Rankin* v. *Cowden*, 66 Ill. App. 139; *Hyde Park* v. *Cemetery Ass.* 119 Ill. 141; *Trausch* v. *Cook County*, 147 id. 547; *Cantrell* v. *Seaverns*, 168 id. 171; *Lewis* v. *Cook County*, 72 Ill. App. 155.

The rates of fare to be charged on the west and north side lines was the subject of consideration when their special charters were granted. Under the doctrine above mentioned the subsequent general act,—that of 1872,—must be construed to have no application to those systems. And this is, of course, true, though clause 42 be held to include street railways. The legislature (having used in the subsequent act language which, at best, refers to street railroads by general words only,) is deemed to have intended not to include the roads so chartered. If the municipality has the right to require transfers it must be because it can regulate fares, for its sole power is found in a clause authorizing rate regulation. If it can regulate rates it is empowered by a general act to meddle with that which has received special attention from

the legislature. The cases on this point most like that at bar are *Railroad Co.* v. *Hoboken,* 41 N. J. L. 71, and *Hyde Park* v. *Cemetery Ass.* 119 Ill. 141.

Section 1723 of the Municipal Code of Chicago did not contemplate and has no application to systems of street railways in existence when it was enacted and which have since then been united. (*Ellis* v. *Railway Co.* 67 Wis. 135; *Railway Co.* v. *Railroad Co.* 38 Fed. Rep. 58.) Wherever legislation has been held prospective it has related to subjects concerning which the legislative will is the final arbiter. Where, however, an act or ordinance must be reasonable to be valid, when the judgment of the legislative body and not the will is the vital element, the act or ordinance must relate only to existing conditions, otherwise what should be judgment is prophecy.

The words, "the rate of fare shall not exceed five cents," found in the charters of the north and west side companies, constituted contracts binding the State and the city that the fares on the lines of each of said companies should not be reduced below five cents, directly or indirectly. *Detroit* v. *Railroad Co.* 184 U. S. 368; *Railroad Co.* v. *Cleveland,* 94 Fed. Rep. 385; *Detroit* v. *Railroad Co.* 60 id. 161.

Any impairment whatsoever of the obligation of legislative contracts is forbidden. Cases last cited above; *Walla Walla* v. *Water Co.* 172 U. S. 15; *Dartmouth College case,* 4 Wheat. 699; *Railroad Co.* v. *Bowers,* 4 Houst. 506.

The legislature of the State of Illinois had the power, in 1865, to make irrevocable contracts as to rates of fare for the period of ninety-nine years. Cooley on Const. Lim. (6th ed.) 334; *Banking Co.* v. *Smith,* 128 U. S. 174; *Pingree* v. *Railroad Co.* 118 Mich. 232; *Walla Walla* v. *Water Co.* 172 U. S. 15; *Water Co.* v. *Freeport City,* 180 id. 593; *Gas Co.* v. *Louisiana Light Co.* 115 id. 672; *Railroad Co.* v. *Bowers,* 4 Houst. 506; *Detroit* v. *Railroad Co.* 184 U. S. 368; 60 Fed. Rep. 161; Opinion of Francis Adams, Proceedings of city council for 1883-84.

The act of 1855 (3 Starr & Curt. p. 3247,) and the private charters of appellant's lessors authorized them to lease to appellant; (*Chicago* v. *Evans*, 24 Ill. 52;) and appellant's own charter, as well as said general act, empowered appellant to take, by lease, from them. The charters of the original north and west side companies authorized assignment of their franchises and assured to their successors all rights and privileges bestowed. The right of a corporation to assign, granted by a charter which does not reserve the right of amendment or repeal, is irrevocable, and may be exercised after an act is passed or constitution adopted, the effect of which, if binding on the corporation, would be to prevent assignment. *Zimmer* v. *State*, 30 Ark. 678.

But if it should be granted that the legislature had the power thus to limit the market of appellant's lessors, it would still be most unwarranted to say that the legislature intended, by section 9 of the act on corporations, to exercise its power to prevent corporations from acquiring, by assignment, the legislative contract rights of other corporations, and from retaining them, as legislative contract rights, during the period for which they were originally granted. The general reservation by a legislature of the power to make regulations and provisions binding on a newly organized corporation is not specific enough to admit of interference with a legislative contract right to collect a certain rate of fare, acquired by assignment from corporations having such contract right. See authorities cited *supra; Detroit* v. *Railroad Co.* 184 U. S. 397.

Where a constitution is in force authorizing amendment or repeal of all corporate charters, this reservation only leaves in the State the power to affect the rights, privileges and immunities derived directly from the State. Franchises, privileges and property rights acquired by a corporation directly by assignment from sources other than the State are not under the control

of the State. *Tomlinson* v. *Jessup*, 15 Wall. 459; *People* v. *Stanford*, 77 Cal. 371; *Railroad Co.* v. *Maine*, 96 U. S. 510; *Water Co.* v. *San Buenaventura*, 56 Fed. Rep. 351; *Railroad Co.* v. *Board of Railroad Comrs.* 78 id. 254.

The right of appellant to charge a five cent fare on each of the lines of its lessors was not derived directly from the State, but was acquired by purchase from the original companies, and this right being so acquired is therefore no more subject to impairment in its hands than it was in the hands of the original companies. *Water Co.* v. *San Buenaventura*, 56 Fed. Rep. 339; *Citizens' Street Railway Co.* v. *Memphis*, 53 id. 715.

The right to take a certain toll, reserved in a private charter, which charter is in the nature of a contract, is not a mere personal immunity, but is a franchise and property. *Dartmouth College case*, 4 Wheat. 699; *Pickard* v. *Railroad Co.* 130 U. S. 637; *Morgan* v. *Louisiana*, 93 U. S. 217; *Beekman* v. *Railroad Co.* 3 Paige, 74; *Davis* v. *Mayor*, 14 N. Y. 523; *Railroad Co.* v. *Campbell*, 44 Cal. 90; *Sellers* v. *Lumbering Co.* 39 Wis. 525; *Railroad Co.* v. *Reid*, 13 Wall. 268; *Navigation Co.* v. *United States*, 148 U. S. 348.

In some cases the Supreme Court of the United States has held that an exemption from taxation is a personal immunity, at the same time saying that the right to take tolls is a franchise and property. *Pickard* v. *Railroad Co.* 130 U. S. 637; *Morgan* v. *Louisiana*, 93 id. 217.

A lease of railroad property made under statutory authority carries all franchises of the lessor, including whatever right it has to take tolls. *Railway Co.* v. *Railroad Co.* 150 Ill. 484; *Chicago* v. *Evans*, 24 id. 54; *People* v. *Railroad Co.* 176 id. 520; *Railway Co.* v. *Elevated Railroad Co.* 152 id. 519; *Campbell* v. *Railroad Co.* 23 Ohio St. 168; *Water Co.* v. *San Buenaventura*, 56 Fed. Rep. 339.

The lessee is always held to operate under the franchises of the lessor, and is privileged to charge the rates of fare which the lessor might lawfully charge. In *Fisher* v. *Railroad Co.* 46 N. Y. 644, it was held that a railroad

which was required by its charter to carry passengers for two cents per mile, might nevertheless charge four, cents per mile on the line of a leased road, where the lessor was authorized by its charter to charge four cents per mile.   This case was followed in *Barnett* v. *Railroad Co.* 65 N. Y. Supp. 1072; 53 App. Div. 432.

The right of a railroad company to lease its franchises exists only by legislative authority.   (*Hayes* v. *Railroad Co.* 61 Ill. 422.)   Therefore, a lease which uses only the words of the statute in its granting clause is to be construed to pass whatever the statute authorizes the lessor to lease.   Most of the cases cited above were decided under statutes which, like the act of 1855, did no more than authorize the companies to lease their roads and property.   From this it is evident that proof by appellee of the demise to appellant of the property and franchises of the original companies absolved appellant from the necessity of introducing the leases in evidence.   It is not possible that any court would require a defendant to prove a fact already established by the plaintiff.

Additional points and authorities for appellant on rehearing:

The court says the act of 1855 did not contemplate the leasing of street railroad properties by a corporation· which had not itself built or become the owner of a street railroad.   To reach this conclusion the court reads something into the act which is not there.   Moreover, it presumes that the appellant had not built or begun to build when it leased the North and West Chicago railroads, for there is no evidence upon the point.   A presumption of an unlawful act is never made.   *Railroad Co.* v. *Davis,* 34 Kan. 199.

If appellant deemed it wise to lease first and build afterwards, its charter, which granted it the right to construct, own, purchase, acquire and lease street railroads, etc., taken in connection with the act of 1855, authorized

it so to do, and to proceed, in any manner it approved, to acquire a system of street railroads extending through the several counties. *Hill* v. *Nesbit,* 100 Ind. 348; *Bridgeport* v. *Railroad Co.* 15 Conn. 475.

The rights, powers, privileges, franchises and property which a corporation acquires by lease, purchase or otherwise, directly from sources other than the State, though they emanate indirectly from the State, are not subject to regulation because of anything contained in section 9 of the Incorporation act. *Water Co.* v. *San Buenaventura,* 56 Fed. Rep. 339; *People* v. *Stanford,* 77 Cal. 371; *Water Co.* v. *Los Angeles,* 88 Fed. Rep. 739; *Water Co.* v. *Estrada,* 117 Cal. 168; *Tomlinson* v. *Jessup,* 15 Wall. 459; *Railroad Co.* v. *Maine,* 96 U. S. 510.

*Danville* v. *Water Co.* 178 Ill. 299, merely decided that rates fixed by a city were necessarily subject to regulation, because the city had no power to contract as to rates. That a corporation could not acquire, by lease or purchase, an existing valid right or franchise was not decided.

CHARLES M. WALKER, Corporation Counsel, HENRY SCHOFIELD, and CLARENCE N. GOODWIN, for appellee:

The common council of the city of Chicago had the power, under the charter of 1851 of the city of Chicago, to prescribe a reasonable maximum rate of fare to be charged by a person, firm or corporation engaged in the business of carrying passengers for hire, for carrying a person from one point to another within the limits of the city of Chicago. The common council of said city had the same power under the charter of 1863 of said city, said charter being an amendment of the charter of 1851. The general act for the incorporation of cities and villages, passed after the adoption of the present constitution of 1870, and under which act the city of Chicago re-organized in 1875, gives the same power to the city council of Chicago. Private Laws of 1863; clause 42 of

199—33

article 5 of City and Village act; Private Laws of 1851, sec. 4, clause 9, p. 132; *Allerton* v. *Chicago*, 6 Fed. Rep. 555; *Railway Co.* v. *Philadelphia*, 58 Pa. St. 119; *Deane* v. *Railway Co.* 69 Ill. App. 165.

Section 4 of the Horse and Dummy act of 1874, passed pursuant to section 4 of article 11 of the constitution, also confers upon the city council of the city of Chicago power to prescribe a maximum rate of fare to be charged by street car companies.   Hurd's Stat. chap. 66.

The power thus delegated to the council of the city of Chicago was a power to legislate,—to fix reasonable maximum rates by law,—and not to make a contract with any person, firm or corporation engaged in the business of carrying passengers for hire, obligating itself (the council) never to change the rates once fixed.   *Munn* v. *Illinois*, 94 U. S. 116; *Railroad Co.* v. *Iowa*, id. 155; *Peck* v. *Railroad Co.* id. 164; *Railroad Commission cases*, 116 id. 325; *Railroad Co.* v. *Gill*, 156 id. 649; *Railway Co.* v. *United States*, 76 Fed. Rep. 186; *SanDiego Co.* v. *National City*, 174 U. S. 739.

The grant is personal to the grantee unless apt words are used showing that the grant is transferable by the grantee.   Doubt as to transferability is fatal.   *Railroad Co.* v. *Gill*, 156 U. S. 649; *Railroad Co.* v. *Thomas*, 132 id. 174; *Morgan* v. *Louisiana*, 93 id. 217; *Delaware Railroad Tax*, 18 Wall. 206; *Wilm. and Weld. Railroad Co. case*, 146 U. S. 279.

A transfer of "property," or of "rights and privileges," or of "franchises," will not carry an immunity from taxation, nor from legislative control over rates, nor an immunity from exercise of any other governmental power which the Supreme Court of the United States has held, wisely or unwisely, to be alienable.   *Picard* v. *Railroad Co.* 130 U. S. 637; *Turnpike Co.* v. *Sandford*, 164 id. 578.

The words, "the rate of fare shall not exceed five cents," only limit the power of the grantee, in the absence of legislation, to fix its rates.   They do not limit the power of the city.   *Railroad Co.* v. *United States*, 76 Fed. Rep. 186.

Mr. CHIEF JUSTICE MAGRUDER delivered the opinion of the court:

There is no conflict between the parties as to the facts in the three cases here under consideration. The proof shows, that appellant refused to give a passenger on its North Clark street car line a transfer ticket, entitling such passenger to a ride, without additional fare, upon its Madison street line. The proof also shows that the appellant refused to give to a passenger on its Madison street car line a transfer ticket, entitling such passenger to a ride, without additional fare, upon its North Clark street car line. The proof also shows, that the appellant refused to give to a passenger on its VanBuren street car line a transfer ticket, entitling such passenger to a ride, without additional fare, upon its Halsted street car line. Under the facts, therefore, appellant was guilty of a violation of section 1723 of the Revised Code of Chicago, as the same is set forth in the statement preceding this opinion.

The only questions, which arise upon the record, and which are presented for our consideration, are questions of law, growing out of the giving and refusal of the propositions of law, submitted by the parties, and set forth in the statement preceding this opinion.

Counsel for appellant make three points in their brief in support of their contention that the judgments, entered by the criminal court of Cook county in these three cases, are erroneous. These three points are as follows: First, that the charters of appellant's constituent companies constitute contracts as to rates of fare, and that section 1723 of the municipal code of Chicago impairs these contracts, and is, therefore, in violation of the guaranties of the constitutions of the United States, and of the State of Illinois; second, that the city of Chicago has no power under the statutes of Illinois, and has not been authorized by the legislature of Illinois, to regulate

fares charged by street railroad companies, or to require such companies to furnish transfer tickets; and third, that said section 1723, passed in 1890 and re-enacted in 1897, and applicable to conditions then existing, has no application to transfers between the north and west side systems of appellant.

*First*—The second point, thus made by appellant, will be considered first. Has the common council of the city of Chicago the power to prescribe a reasonable maximum rate of fare to be charged for carrying a person from one point to another within the limits of the city of Chicago by a person, firm or corporation engaged in the business of carrying passengers for hire on street railways?

The ordinance of June 26, 1890, re-enacted on April 8, 1897, of which sections 1723 and 1725 are parts, is an ordinance which prescribes the maximum rate of fare to be charged. It provides that the rate of fare to be charged by any person, firm, company or corporation owning, leasing, running or operating street cars or other vehicles for the conveyance of passengers on any street railroad within the limits of the city of Chicago for any distance within the city limits shall not exceed five cents for each passenger over twelve years of age, and half fare for each passenger over seven and under twelve years of age for one continuous trip, except when such street cars or other vehicles shall be chartered for a specific purpose. (Council Proceedings of 1890, 1891, p. 434). In order to determine whether or not the city of Chicago has the power to prescribe the reasonable maximum rate of fare to be charged by street railway companies, it will be necessary to examine the provisions of the present and former charters of the city.

Appellant's contention, that no power whatsoever over street railway companies, has ever been granted by the legislature to the city of Chicago, will be found to be incorrect upon an examination of the city charters of 1851, 1863 and 1872.

On February 14, 1851, the legislature passed an act, entitled "An act to reduce the law incorporating the city of Chicago and the several acts amendatory thereof, into one act, and to amend the same." Section 4 of chapter 4 of this act of 1851 provides as follows:

"Sec. 4. The common council * * * shall likewise have power within the jurisdiction of the city by ordinance: * * * *Ninth*—To license, regulate and suppress hackmen, draymen, carters, porters, omnibus drivers, cabmen, packers, carmen, and all others who may pursue like occupations with or without vehicles, under other cognomens, and prescribe their compensation. * * * *Sixty-second*—The common council shall have power to make, publish, ordain, amend and repeal all such ordinances or by-laws and police regulations, not contrary to the constitution of the State, for the good government and order of the city and the trade and commerce thereof, as may be necessary or expedient to carry into effect the powers vested in the common council, or any officer of said city, by this act; and enforce observance of all rules, ordinances, by-laws and police and other regulations made in pursuance of this act, by penalties not exceeding $100.00 for any offense against the same." (Private Laws of Ill. 1851, pp. 142, 143, 148).

On February 13, 1863, the legislature passed an act, entitled "An act to reduce the charter of the city of Chicago, and the several acts amendatory thereof, into one act, and to revise the same." Section 8 of chapter 4 of this act of 1863 provides as follows:

"Sec. 8. The common council * * * shall likewise have power within the jurisdiction of the city by ordinance: * * * *Ninth*—To license, regulate and suppress hackmen, draymen, carters, porters, omnibus drivers, cabmen, carmen and all others, whether in the permanent employment of any individual, firm or corporation, or otherwise, who may pursue like occupations, with or without vehicles, and prescribe their compensation.

\* \* \*  *Forty-ninth*— \* \* \*  Also to regulate the running of horse railway cars, the laying down of tracks for the same, the transportation of passengers thereon, and the kind of rail to be used. \* \* \*  *Sixty-fourth*," which gives general power to amend and repeal ordinances and make such ordinances as may be necessary, the clause being almost identical with the corresponding clause in the act of 1851 as above set forth. (Private Laws of Ill. 1863, pp. 40, 56, 57, 60, 62).

On April 10, 1872, the legislature passed an act entitled "An act to provide for the incorporation of cities and villages." Section 1 of article 5 of this act of 1872 provides as follows:

"Sec. 1. The city council in cities, and president and the board of trustees in villages, shall have the following powers: \* \* \*  *Forty-second*—To license, tax and regulate hackmen, draymen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and to prescribe their compensation. \* \* \* *Ninetieth*—The city council or board of trustees shall have no power to grant the use of or the right to lay down any railroad tracks in any street of the city to any steam or horse railroad company, except upon the petition of the owners of the land representing more than one-half of the frontage of the street, or so much thereof as is sought to be used for railroad purposes. \* \* \* *Ninety-sixth*—To pass all ordinances, rules, and make all regulations proper or necessary to carry into effect the powers granted to cities or villages, with such fines or penalties as the city council or board of trustees shall deem proper: *Provided*, no fine or penalty shall exceed $200.00 and no imprisonment shall exceed six months for one offense." (1 Starr & Curt. Ann. Stat.—2d ed.— pp. 689-715). Said clause ninetieth was amended in 1887 so as to include dummy, electric, cable, or other railroad companies, whether incorporated by this State under general or special law. (Sess. Laws of Ill. 1887, p. 108).

The city of Chicago has adopted, as its charter, the City and Village act of 1872 above referred to. It will be noticed, that the forty-second clause of section 1 of article 5 of the act of 1872 is substantially the same as the ninth clause of section 4 of chapter 4 of the act of 1851, and the ninth clause of section 8 of chapter 4 of the act of 1863, so far as is material to the questions here involved. Under the act of 1872 the common council of the city of Chicago has power to regulate hackmen, omnibus drivers, cabmen, "and all others pursuing like occupations, and to prescribe their compensation." Street railway companies come within the purview and meaning of the words, "all others pursuing like occupations," as used in connection with hackmen, omnibus drivers and cabmen. The occupation of hackmen, omnibus drivers and cabmen is the carrying of passengers for hire. All of the last named vehicles are drawn by horses. The acts of 1859 and 1861, under which appellant claims its rights herein, were acts to promote the construction of horse railways, and to authorize the extension of horse railways in the city of Chicago. The ordinances of 1858 and of 1859, under which also the appellant claims its rights, are ordinances authorizing the construction, extension and operation of horse railways in the streets of Chicago. The railways, referred to in these acts and ordinances, were nothing more than carriages drawn by horses, with the exception that such carriages moved upon fixed iron rails, in a regular track, with wheels, while the other vehicles mentioned go with wheels upon the ordinary street way. The occupation of the appellant is the carrying of passengers for hire, and, therefore, its occupation is like the occupation of hackmen, omnibus drivers and cabmen. By the application of the maxim *ejusdem generis*, which is only an illustration or specific application of the broader maxim *noscitur a sociis*, the rule is deduced that, "when general words follow an enumeration of particular cases, such words apply only

to cases of the same kind as those expressly mentioned, or, stated in different language, the word 'other,' following an enumeration of particulars, embraces enumerated particulars of like nature only, unless a broader sense is obviously intended." (*County of Union* v. *Ussery*, 147 Ill. 204; *Misch* v. *Russell*, 136 id. 22; *First Nat. Bank of Joliet* v. *Adam*, 138 id. 483; *Ritchie* v. *People*, 155 id. 98). Here, the general words, to-wit, "all others pursuing like occupations," follow an enumeration of particular cases, to-wit, hackmen, omnibus drivers and cabmen, and, consequently, such general words apply to cases of the same kind as those expressly mentioned.

That this is the correct view of the meaning of the forty-second clause of the present charter and the clauses of a like nature in the charters of 1851 and 1863, is shown by the purport of decisions upon the subject. In *Frankford, etc. Railway Co.* v. *City of Philadelphia*, 58 Pa. St. 119, an act of the Pennsylvania legislature provided "that the select and common councils of the city of Philadelphia shall have authority (by ordinance or ordinances) to provide for the proper regulation of omnibuses, or vehicles in the nature thereof; and to this end it shall be lawful for the said councils, etc., to provide for the issuing of licenses to such, and so many persons, as may apply to keep and use omnibuses or vehicles in the nature thereof; and to charge a reasonable annual or other sum therefor." In construing this act, the lower court in Pennsylvania, speaking through Mr. Justice Sharswood, said: "Now, surely no one can doubt that a passenger railway car is a vehicle in the nature of an omnibus, if it is not itself an omnibus running on a railroad." When the case was taken by appeal to the Supreme Court of Pennsylvania, the judgment of the lower court was affirmed, and the opinion affirming it was delivered by Mr. Justice Strong, afterwards a member of the Supreme Court of the United States, in which he says, in reference to this act: "It plainly authorizes regulation by the is-

sue of licenses. And we are of opinion that it applies to passenger railway cars. They are omnibuses, or if not, they are vehicles in the nature of omnibuses. They are open to all, intended for all. The change of form from that of anything, known when the act of assembly was passed, is not a change of the nature of the vehicle. In one city, at least, of Europe, large vehicles intended for indiscriminate public use, run sometimes upon a railway track, and at other times upon a common pavement. Nobody can doubt they are omnibuses. The form of the wheels, or the character of the roadway, over which a vehicle runs, does not determine its nature so much as do the uses to which it is put, and for which it was designed."

In *Allerton* v. *City of Chicago*, 6 Fed. Rep. 555, this very clause 42 of section 1 of article 5 of the act of 1872 was given the same construction, which is here put upon it. In the latter case it was held, in an opinion by the late Judge Drummond, that the general law of Illinois for the incorporation of cities and villages in the State, which provided that the city council in cities should have authority to license hackmen, draymen, omnibus drivers, cabmen, expressmen, and all others pursuing like occupations, and to prescribe their compensation, included street railways within its meaning. The case of *Frankford, etc. Railway Co.* v. *City of Philadelphia, supra*, was there referred to as an authority upon this subject, and it was there said by Drummond, C. J.: "But it is claimed it does not include the street railway, because it is not pursuing an occupation like any of those named. Omnibuses may be licensed. They may pass over even the same streets as those occupied by the horse railways, and they may carry passengers in the same manner. The only distinction, which can be called substantial between the two classes of occupation, is that one carriage goes upon iron rails, in a regular track, with wheels, and the other carriage goes with wheels upon the ordinary street way. The Supreme Court of Pennsylvania has held that these

street railway carriages are of a like nature as omnibuses, and there can be no doubt, I think, of the right of the city to .demand a license from all omnibus drivers, and to include every omnibus which may belong to a particular company or corporation, and to require the payment of a license for such omnibus that may be so owned and used."

In *Farwell* v. *City of Chicago*, 71 Ill. 269, speaking of an ordinance adopted under and in pursuance of said clause 42 of the act of 1872, this court said: "The spirit of the ordinance is, to bring the class of carriers therein named under the police regulations of the city. It is designed to operate upon those, who hold themselves out as common carriers in the city for hire, and to so regulate them as to prevent extortion, imposition and wrong to strangers and others compelled to employ them, in having their property or persons carried from one part of the city to another. This is a rightful exercise of the police power." It has often been held that a street railway company is a common carrier of passengers for hire. (*North Chicago Street Railroad Co.* v. *Williams*, 140 Ill. 275; *North Chicago Street Railroad Co.* v. *Wrixon*, 51 Ill. App. 307; *North Chicago Street Railroad Co.* v. *Cook*, 145 Ill. 551). In *Chicago, Burlington and Quincy Railroad Co.* v. *West Chicago Street Railroad Co.* 156 Ill. 255, it was held that the construction of a street railroad is merely a mode of facilitating existing travel, and of modifying or changing the existing public use; that there is thereby added an additional mode of conveyance to those already in use upon the street; that the street car carries along the street such passengers as would otherwise be obliged to pass over it on foot or in other vehicles, and that thereby the ordinary street railway merely furthers the original uses of the street by relieving the pressure of local travel. It necessarily follows, that those, whose business it is to propel street railway cars along the iron tracks laid in the public streets of a city, are engaged in the business of carrying pas-

sengers for hire, and that their occupation is of a like nature with the occupation of hackmen, omnibus drivers and cabmen, whose business also is the carriage of passengers for hire. The general doctrine is that the legislature has power to regulate the charges of common carriers. (*Munn* v. *Illinois*, 94 U. S. 113; *Chicago, etc. Railroad Co.* v. *Iowa*, id. 155; *Ruggles* v. *People*, 91 Ill. 256; *Ruggles* v. *Illinois*, 108 U. S. 526). The legislature, having such power, can confer it upon the common council of the city. In other words, the municipality may exercise the power by delegation from the State. (*Rogers Park Water Co.* v. *Fergus*, 178 Ill. 571; *City of Danville* v. *Danville Water Co.* 180 id. 235; *Dean* v. *Chicago General Railway Co.* 64 Ill. App. 155; *Chicago Packing Co.* v. *City of Chicago*, 88 Ill. 225).

Therefore, when the legislature gave to the city of Chicago, under its charters above referred to, the power to regulate, and prescribe the compensation of, street railway companies as carriers of passengers, it gave the city power to pass sections 1723 and 1725 set forth in the statement preceding this opinion. The grant of the power to regulate the occupation, and prescribe the compensation of those pursuing it, is accompanied by a grant of power to pass all such ordinances, rules and regulations as may be proper or necessary to carry into effect the power so granted.

The appellant introduced in evidence, and relies upon, the ordinance of August 16, 1858, set forth in the statement preceding this opinion. Section 6 of that ordinance provides that "the rate of fare for any distance shall not exceed five cents except when cars or carriages shall be chartered for a specific purpose." That ordinance was passed before the legislature passed the act of February 14, 1859. At the time of the passage of the ordinance of August 16, 1858, there was no law or statute in Illinois, conferring upon the common council of any city the power to make a contract with any person, firm or corporation, engaged in the business of carrying passengers

for hire, obligating the city never to change the rates once fixed, or to make a contract with any such person, firm or corporation in relation to a maximum rate of fare to be charged. Hence, the common council could not have passed section 6 of the ordinance of 1858 in pursuance of any act of the legislature, granting the power to make such contract. The only act of the legislature then existing, which conferred upon the common council the power to pass section 6 of the ordinance of 1858, was the act of February 14, 1851. If the common council of the city had no power, under clause 9 of section 4 of chapter 4 of said act of 1851, to pass said section 6, then it was without any such power at all, as there was no other source, from which the same could be derived, except the act of 1851.

The act of February 14, 1859, by the second section thereof, granted to the Chicago City Railway Company the power to construct, maintain and operate a single or double track railway within the then present or future limits of the south or west divisions of the city of Chicago, as the common council of said city had authorized the corporators therein named, or any of them, or should authorize said corporation so to do, "in such manner and upon such terms and conditions, and with such rights and privileges as the said common council has, or may, by contract with said parties, or any or either of them, prescribe." The last clause is elliptical, and the word, "prescribed," to which the word "has" applies, was accidentally omitted. If the word thus omitted be supplied, the clause should read as follows: "With such rights and privileges as the said common council has prescribed, or may, by contract with said parties, or any or either of them, prescribe." The words, "by contract with said parties or any or either of them," qualify the words "may prescribe." That is to say, the right to contract was a right to be exercised in the future. The words, "with such rights and privileges as the said common council

has prescribed," refer to the past.   There was no other action of the common council, taken before the passage of the act of February 14, 1859, except the ordinance of August 16, 1858.   By the use of the words, "with such rights and privileges as the said common council has prescribed," the legislature could not have referred to any other action of the common council than the passage of the ordinance of August 16, 1858.   It thereby recognized the power of the common council to pass that ordinance, and the appellant here introduces it and relies upon it.   The legislature, by thereby affirming and recognizing the passage of the ordinance of August 16, 1858, also recognized the power of the common council to pass that ordinance under clause 9 of section 4 of chapter 4 of the charter of 1851.

Again, in the ordinance of May 23, 1859, the language shows that the common council, which passed that ordinance, relied upon its power to do so under said clause 9 of the charter of 1851.   Section 1 of the ordinance of May 23, 1859, recites that, under and by virtue of the act of the legislature approved February 14, 1859, "and by virtue of the powers and authority in the said common council otherwise by law vested," the council thereby granted permission to the Chicago City railway to lay a single or double track for a railway, etc.   In other words, the ordinance of May 23, 1859, was not only passed in pursuance of the act of February 14, 1859, but also by virtue of the power and authority vested by law in the common council otherwise than by the act of February 14, 1859. Necessarily, the power, referred to in section 1 of the ordinance as otherwise by law vested in the council, was the power so vested by virtue of clause 9 of section 4 of chapter 4 of the charter of 1851.   Section 7 of the ordinance of May 23, 1859, provided that "the rate of fare for any distance shall not exceed five cents except when cars or carriages shall be chartered for specific purposes."   Also, the ordinance, passed on May 23, 1859,

authorizing the construction and operation of horse railways in the north division of the city of Chicago, provides, in section 6 thereof, that "the rates of fare for any distance within the city limits shall not exceed five cents for each passenger, except when cars or carriages shall be chartered for a specific purpose." The fixing of a maximum rate of five cents for each fare for any distance can as well be attributed to an exercise of the power to prescribe compensation under the charter of 1851, as to any power to make a contract upon the subject, embodied in the act of February 14, 1859.

If the common council had the power to fix the maximum rate of fare for any distance at five cents, as was done by said section 1723, it also had the power to provide for transfer tickets in the manner and at the places and within the time named in said section 1723. The requirement as to transfer tickets, transferring the passengers from one line to another of the same company, is a mere incident to the power to fix the maximum rate of fare. The charter of the city gave its common council power to prescribe the compensation of persons, pursuing the occupation of operating street railways. The compensation referred to can be none other than the fare to be charged for carrying passengers. The power to fix the rate of fare must necessarily include the power to fix the rate for carrying a passenger over two lines operated by one company, as well as the power to fix the rate for carrying a passenger over one line operated by such company, the question being not as to the reasonableness of the charge, but as to the power to regulate or fix the charge.

Our conclusion upon this branch of the case, therefore, is, that, as a question of power simply, the common council of the city of Chicago was authorized to pass the ordinance of June 26, 1890, subsequently re-enacted on April 8, 1897, and designated herein as sections 1723 and 1725.

*Second*—It is furthermore insisted by the appellant, that section 1723 of the municipal code of Chicago, if enforced against appellant, will impair its alleged contract rights, and that, therefore, the section is in violation of the guaranties of the constitutions of the United States and of the State of Illinois.

The party, insisting that its contract rights are violated by these sections 1723 and 1725, is the appellant, the Chicago Union Traction Company, organized in May, 1899. It is not claimed, nor could it be, that there was, or is, any contract made directly between the State, or the city council of Chicago as the subordinate agency of the State, and the Chicago Union Traction Company, appellant herein. The contention of the appellant is, that contracts were made in 1859 and 1861 with the North Chicago City Railway Company and the Chicago West Division Railway Company, and that those contracts have passed by assignment to the appellant, the Chicago Union Traction Company. It is claimed by the appellant that in 1886, or thereabouts, the North Chicago City Railway Company executed a lease of all its property and privileges to a new corporation then organized, called the "North Chicago Street Railroad Company," and that the Chicago West Division Railway Company in 1889, or thereabouts, executed a lease of its property, privileges and franchises to a new corporation then organized, called the "West Chicago Street Railroad Company." No such leases as these have been introduced in evidence or are in this record. What their terms are it is impossible for us to know, so far as the present record shows. The charters, or certificates of organization of the North Chicago Street Railroad Company and the West Chicago Street Railroad Company are not in the record, and were not introduced upon the hearing below. As, however, those corporations were organized in 1886 and 1889, they must have been organized under the general Incorporation act of this State, passed in 1872. Since the adop-

tion of the constitution of 1870, no corporation could be formed in this State under a special charter.   Section 1 of article 11 of the constitution of 1870 provides that "no corporation shall be created by special laws, or its charter extended, changed or amended, except those for charitable, educational, penal or reformatory purposes, which are to be and remain under the patronage and control of the State, but the General Assembly shall provide, by general laws, for the organization of all corporations hereafter to be created." Counsel for appellant seek to avoid the difficulty, arising from the absence of these leases from the record, by saying that their existence is admitted by counsel for appellee.   There seems to be an admission, on the part of the appellee, that the Chicago West Division Railway Company and the North Chicago City Railway Company leased their railway properties, respectively, to the West Chicago Street Railroad Company and the North Chicago Street Railroad Company, but there is no admission, so far as we are able to discover, that there was any transfer or assignment of the contracts, claimed to exist in favor of the present appellant.

What are those contracts?   The ordinances of 1858 and 1859, in relation both to the West Division Railway Company and the North Chicago City Railway Company, provided that the rate of fare for any distance, or any distance within the city limits, should not exceed five cents, or five cents for each passenger.   It is claimed, on the part of appellant, that these ordinances, taken in connection with the acts of the legislature of 1859 and 1861, referred to in the statement preceding this opinion, constituted contracts between the city and said railway companies, to the effect that the companies had a right to charge as much as five cents for one fare, and that the city had no right thereafter to reduce the fare to any figure below five cents.   In other words, the contention of appellant is that the words, "the rate of fare shall not

exceed five cents," constitute a contract, binding the municipality not to reduce fares below that rate.  Section 1723 does not in terms fix a rate of fare less than five cents.  On the contrary, it provides, just as the earlier ordinances, upon which appellant relies as constituting its contract, provided, that the rate of fare to be charged shall not exceed five cents for each passenger, etc.  But the contention is, that the requirement of a transfer ticket from one line to another line, operated by the same company, necessarily reduces the fare below five cents, appellant claiming the right to charge five cents over one of its lines and an additional five cents over another of its lines.

We pause not at this point to determine the correctness of this statement of the contracts, the only object at this stage of the discussion being to state what such contracts are claimed to be, with a view of determining whether they have been transferred or assigned to the present appellant.  In order to show that such contracts, if they existed, are the property of the present appellant, it is not sufficient merely to show assignments or leases from the Chicago West Division Railway Company to the West Chicago Street Railroad Company, and from the North Chicago City Railway Company to the North Chicago Street Railroad Company.  The West Chicago Street Railroad Company and the North Chicago Street Railroad Company are not here insisting upon any contracts, or complaining of the violation of any contracts. It devolves upon appellant to show that there were assignments, or leases amounting to assignments, from the West Chicago Street Railroad Company and the North Chicago Street Railroad Company to the present appellant, the Chicago Union Traction Company.  There is in the record no lease from the North Chicago Street Railroad Company to the present appellant, but there has been introduced in evidence, and appears in the record, a lease purporting to have been made on June 1, 1899,

from the West Chicago Street Railroad Company to the present appellant. In one aspect of these cases, the failure of the testimony in the respect thus indicated would necessarily lead to an affirmance of the judgment entered by the court below.

But if it be conceded, as is contended for by the appellant, that the leases were made by the original companies to the companies organized in 1886 and 1889, and by both of these latter companies to the appellant in 1899, did the contracts, if there were contracts in relation to the maximum rate of fare, pass, or have they passed to the present appellant, so as to become the property of the latter?

It is a matter of serious doubt whether the Chicago West Division Railway Company became vested with the right to charge a full fare of five cents for a ride upon any one of its cars in the west division of the city alone. If it did not have such right, then it could not have transferred it, by lease or any other sort of assignment, to the West Chicago Street Railroad Company, nor, by consequence, could the latter have transferred it to the appellant. The ordinance of August 16, 1858, granted to the parties, therein named, the right to operate railway cars in the south and west divisions of the city, and upon streets lying in both of those divisions. When, therefore, section 6 provided that the rate of fare for any distance shall not exceed five cents, the meaning was that it should not exceed five cents for a ride upon streets in the south and west divisions of the city, and from one division to the other. Section 2 of the act of February 14, 1859, authorized the construction and operation of railway cars over such streets within the present or future limits of the south or west division of the city, as the common council had authorized, or should thereafter authorize, in such manner and upon such terms and conditions, with such rights and privileges as the common council had theretofore prescribed, or might by contract

with said parties, or any or either of them, prescribe.
By the terms of said section 2 the railway was to be con-
structed and operated within the present or future limits
of the south and west divisions, and not of one of these
divisions only; and the terms, theretofore prescribed by
ordinance, were that the rate of fare should not exceed
five cents for any distance within the south or west divi-
sion of the city.  Section 10 of the act of 1859 refers to
the grants therein conferred, and the duties therein re-
quired, as being for the south and west divisions of the
city of Chicago.  So, also, the ordinance of May 23, 1859,
granted authority to lay tracks in and along the course
of the streets and bridges of the south and west divisions
of the city, and hence, of course, section 7 of that act,
providing that the rate of fare for any distance shall
not exceed five cents, referred to any distance within the ·
south and west divisions of the city.  Section 2 of the act
of 1861 conferred upon the Chicago West Division Rail-
way Company the powers, theretofore granted to the Chi-
cago City Railway Company, and subjected the Chicago
West Division Railway Company to all the provisions,
contained in the second, third, fifth and sixth sections
of the act of 1859.  If thereby the Chicago West Division
Railway Company acquired the right to charge a maxi-
mum rate of five cents for any distance, it acquired the
right to make the charge in the same way, in which the
Chicago City Railway Company was possessed of that
right; that is to say, the right to charge a fare of five
cents for a ride in the west and south divisions of the
city, or from one point in one of said divisions to a point
in the other of said divisions.  It is true, that an agree-
ment was made in 1863 between the Chicago City Rail-
way Company and the Chicago West Division Railway
Company, whereby the former company agreed to sell
and convey to the latter all of its property, rights and
privileges, and that, by deed executed on the next day,
it did sell and convey to the Chicago West Division Rail-

way Company all its property, rights and privileges. But the Chicago City Railway Company did not have at that time the right or privilege to charge a fare of five cents for a ride on the west side, and another fare of five cents for a ride on the south side, but it had only a right to charge five cents for a ride in both the west and south divisions of the city. There is nothing in the agreement or the deed, executed between the Chicago City Railway Company and the Chicago West Division Railway Company, which provides that the one should charge a full fare of five cents for a ride on the south side, and the other should charge a full fare of five cents for a ride on the west side. Nothing in the agreement or the deed specified what proportion of five cents for a full ride from one division to the other should be charged by each company after the separation between the two. Originally the Chicago City Railway Company had a right to lay its tracks and operate its cars in the west division, as well as in the south division, and to charge a fare of five cents for a ride anywhere in the two divisions. It is left uncertain, by the acts of the legislature and by the agreements between the parties, as to how each company, after its separation from the other, should charge for the conveyance of passengers, and at what rate such charge should be made.

But, conceding that the effect of the acts of the legislature and of the ordinances, and of the agreements between the two corporations, was that each should charge five cents for a ride in the division in which it operated its cars, the question still remains whether the contract to make such charge passed by assignment or lease. Counsel for appellant contend that, by section 4 of the act of 1861, the Chicago West Division Railway Company had the power to lease its franchises and property; and this contention is correct. But, was the right conferred upon the original companies by the provision, that the rate of fare for any distance shall not exceed five cents,

such a franchise or such property as could be transferred by lease? From some of the authorities it would seem to be true that the right, conferred by this provision, or these provisions, in regard to the rate of fare, was not a franchise, but a mere exemption.

If the provision, that the rate of fare for any distance should not exceed five cents, conferred upon each. of the original railway companies a mere exemption, it could not be transferred to another company by lease, or assignment, or otherwise. In *St. Louis and San Francisco Railway Co.* v. *Gill*, 156 U. S. 652, it appeared that, by an act of April 4, 1887, the legislature of Arkansas prescribed a maximum rate of three cents per mile for each passenger carried by the railroads of that State; that the St. Louis, Arkansas and Texas Railway Company, organized under the laws of Arkansas, had the right under the laws of the latter State, in force in April, 1880, when it was organized, to charge passenger rates not in excess of five cents per mile, so long as its profits did not exceed fifteen per cent per annum on the capital actually paid in, and that it subsequently leased its railroad to the St. Louis and San Francisco Railway Company; and the question was, whether the St. Louis and San Francisco Railway Company, as assignee of the St. Louis, Arkansas and Texas Railway Company, and owner of its road, franchises and privileges, had succeeded to the right to charge passenger rates not in excess of five cents per mile; and in deciding the case, the court, speaking by Mr. Justice Shiras, said: "It has been frequently decided by this court that a special statutory exemption, or privilege, such as immunity from taxation or a right to fix and determine rates of fare, does not accompany the property in its transfer to a purchaser, in the absence of express direction to that effect in the statute. (*Morgan* v. *Louisiana*, 93 U. S. 217; *Wilson* v. *Gaines*, 103 id. 417; *Chesapeake and Ohio Railway Co.* v. *Miller*, 114 id. 176.) We find here no such express statutory direc-

tion, nor is there any equivalent implication by necessary construction." (See also *Covington and Louisville Turnpike Road Co.* v. *Sandford,* 164 U. S. 578; *Picard* v. *Tennessee, etc. Railway Co.* 130 id. 639). In the *Sandford case, supra,* the court, speaking by Mr. Justice Harlan, said: "When a corporation succeeds to the rights, powers, and capacities of another corporation, it does not thereby or necessarily become entitled to an exemption from taxation. An exemption or immunity from taxation so vitally affects the exercise of powers essential to the proper conduct of public affairs, and to the support of government, that immunity or exemption from taxation is never sustained, unless it has been given in language clearly and unmistakably evincing a purpose to grant such immunity or exemption. All doubts upon the question must be resolved in favor of the public." In the *Picard case, supra,* it was held that legislative immunity from taxation is a personal privilege, not transferable, and not to be extended beyond the immediate grantee, unless otherwise so declared in express terms. In the *Gill case, supra,* the right to fix and determine rates of fare was placed in the same category of exemptions, or privileges, as immunity from taxation. In *Morgan* v. *Louisiana,* 93 U. S. 223, it was held that immunity from taxation granted to a railroad company is not one of its franchises.

In the case at bar, there was no statutory direction, authorizing the transfer of the privilege here under consideration to a purchaser or lessee. The authority, given to the Chicago West Division Railway Company to lease its franchises and property, did not confer the authority to lease or transfer the exemption or privilege here under consideration. If the right conferred by section 4 of the act of 1861 to acquire, unite and exercise the powers, franchises, privileges or immunities conferred upon the Chicago City Railway Company, authorized the Chicago West Division Railway Company to acquire and become the owner of the privilege or exemption in question, it

does not necessarily follow that it was thereby author-
ized to transfer or assign the same to the West Chicago
Street Railroad Company, or any other person or cor-
poration. So far as the North Chicago City Railway
Company is concerned, there is nothing to show that the
latter company ever attempted to transfer such privilege
or exemption, granted to it by the act of 1859 and by the
ordinance of May 23, 1859, to the North Chicago Street
Railroad Company, or to the appellant, or to any other
corporation. The grant is personal to the grantee, unless
apt words are used showing that the grant is transfer-
able by the grantee, and any doubt as to transferability
must be solved against the same. (*St. Louis, etc. Railroad
Co.* v. *Gill, supra; Morgan* v. *Louisiana, supra; Yazoo, etc.
Railroad Co.* v. *Thomas,* 132 U. S. 174; *W. & W. R. R. Co.* v.
*Alsbrook,* 146 id. 279; *Delaware Railroad Tax,* 18 Wall. 206.)

In *Detroit* v. *Detroit Citizens' Street Railway Co.* 184 U. S.
392, the question as to the transferability of such an ex-
emption or privilege, as is here under consideration, did
not arise. In that case it is said, in the statement of the
case, that "the defendant, by its answer, makes no issue
as to the validity of such assignments, or the ownership
by complainant of all of the interests of the former com-
panies in the contracts and ordinances set forth in the
bill." In the *Detroit case,* also, the city council of the city
of Detroit was clothed by the legislature of Michigan
with the power to contract with the street railroad com-
pany in regard to rates. Section 20 of the Street Rail-
road act, referred to in that case, provided that the rates
of toll or fare, which any street railway company may
charge for the transportation of passengers or persons
over their road, shall be established by agreement be-
tween said company and the corporate authorities of the
city or village where the road is located, etc.

In the case at bar, it is true that the act of 1859 con-
fers the right to construct and operate a railway in such
manner and upon such terms and conditions, with such

rights and privileges, as the said common council "may by contract with said parties,. or any or either of them, prescribe." This language, standing by itself, would seem, under the doctrine of the *Detroit case*, to confer the power upon the common council to contract with a street railway company in regard to rates. But section 2 of the act of 1859 also grants the right to construct and operate railways "in such manner and upon such terms and conditions, with such rights and privileges, as the said common council has prescribed." By this reference to the ordinance of August 16, 1858, passed under the charter power of the city, conferred by the act of 1851 as already stated, the legislature evidently regarded the fixing of the rate of fare over these street railways as an exercise of a governmental function of a legislative character by the city authorities under a delegated power from the legislature, as well as a subject for agreement between the parties. The ordinances, passed by the common council and insisted upon as embodying contracts, may have been passed, not in pursuance of the authority to contract in regard to rates, but in pursuance of the exercise of the legislative power delegated to the city authorities by the legislature.

Let it be admitted, however, that we are wrong in the views heretofore expressed, and that, in view of the language contained in the acts of 1859 and 1861 and in the ordinances of 1858 and 1859, contracts were executed between the city and the Chicago West Division railway and the North Chicago City railway, as is claimed by the appellant. It will not be contended that the railway companies, which were parties to the contracts originally, or their assignees, if they were properly assigned, could not waive any provision of the contract, or consent to its change or modification. In the *Detroit case, supra,* the Supreme Court of the United States said, in reference to the contract there under consideration: "It is a contract, which gives the company the right to charge a rate

of fare up to the sum of five cents for a single passenger, and leaves no power with the city to reduce it without the consent of the company." It could be reduced, therefore, with the consent of the company. The question then is, whether there has been any consent on the part of the alleged assignees of the contracts in question to changes or modifications thereof.

If the West Division Railway Company leased its property and privileges in such a way, as to include the right to charge a rate of fare up to the sum of five cents for a single passenger, to the West Chicago Street Railroad Company, it made such lease to a corporation, organized under the general Incorporation act of this State; and if the North Chicago City Railway Company leased its property, privileges and franchises in such a way, as to include the right to charge a rate of fare up to the sum of five cents for a single passenger, to the North Chicago Street Railroad Company, such lease was made to a corporation organized under the general Incorporation act of this State. If the North Chicago Street Railroad Company executed a lease of its property and privileges so as to include the contract in question, to the appellant, it leased it to a corporation organized under the general Incorporation act of this State. The lease of the West Chicago Street Railroad Company to the appellant is in the record in this case. By making such leases to the Chicago Union Traction Company, did the West Chicago Street Railroad Company and the North Chicago Street Railroad Company consent to a modification and change of the contracts, which gave them the right to charge a rate of fare up to the sum of five cents for a single passenger?

As has already been stated, the object, for which the appellant was formed, was "to construct, own, purchase, acquire and lease street railroads in the city of Chicago, etc., * * * and to operate the said railroads owned and leased by it, with animal, cable, electric or other

power, except steam locomotive." One of the purposes, announced in its statement, for which the appellant was organized, was to lease street railroads. The business then, which it was to pursue, was not only the business of constructing, owning, purchasing and acquiring street railroads, but was the business of leasing street railroads. Inasmuch as appellant was organized under the general Incorporation act of this State, it was obliged to conduct its business in accordance with the provisions of that act. Section 1 of the general Incorporation act of this State provides "that corporations may be formed in the manner provided by this act for any lawful purpose except banking, insurance, real estate brokerage, the operation of railroads and the business of loaning money: *Provided,* that horse and dummy railroads, and organizations for the purchase and sale of real estate for burial purposes only, may be organized and conducted under the provisions of this act." (1 Starr & Curt. Ann. Stat.—2d ed.—p. 988). That is to say, horse railroads "may be organized and conducted under the provisions of this act." As appellant was organized under said act, its railroad must be conducted under the provisions of the act. It is the fundamental requirement of its charter, by which the State gave to it its existence, that its railroads should be conducted under the provisions of the general Incorporation act. Before the adoption of the constitution of 1870 great evils grew up in this State by reason of the granting of private charters to corporations. When the constitution was adopted, the people of the State determined to adopt a different policy, and to compel corporations, created by the State, to remain and be subject to the control of the people, speaking through their law-making power. Accordingly, in section 9 of the general Incorporation act it was provided as follows: "The General Assembly shall, at all times, have power to prescribe such regulations and provisions as it may deem advisable, which regulations and provi-

sions shall be binding on any and all corporations formed under the provisions of this act: *And, provided, further,* that this act shall not be held to revive or extend any private charter or law heretofore granted or passed concerning any corporation." (1 Starr & Curt. Ann. Stat.— 2d ed.—p. 1006). When, therefore, appellant was organized and consented that its railroads should be conducted under the provisions of the Incorporation act, it accepted its organization subject to the provision embodied in section 9. In the matter of operating roads leased by it, it was obliged to operate them under such regulations and provisions as the General Assembly might deem advisable. Such regulations and provisions were binding upon it, and it could not conduct its business except in subjection to such regulations and provisions. One of these regulations and provisions was that the common council of the city of Chicago had a right under its charter, as above referred to, to regulate the rates of fare to be charged by it, and to prescribe the compensation, to which it was entitled for the carriage of passengers. Unquestionably, if the appellant, after its organization, had constructed its road, it would be obliged to operate that road subject to the requirements of section 9 above quoted; that is to say, subject to the power of the common council to regulate the rates of fare to be charged by it. When, in the statement of the purposes of its organization, it recites that it is formed for the purpose of leasing street railroads and operating leased railroads, it is just as much subject to regulation by the common council, as though it was operating a road constructed by itself.

In *City of Danville* v. *Danville Water Co.* 178 Ill. 299, this court said (p. 306): "The charter of a corporation, formed under the general Incorporation act, does not consist of its articles of association alone, but of such articles taken in connection with the law, under which the organization takes place. The provisions of the law enter into and form a part of the charter. (*People ex rel.* v. *Chi-*

*cago Gas Trust Co*: 130 Ill. 268). Therefore, the provisions of the general Incorporation act must be regarded as entering into and forming a part of, the charter of the defendant in error." Then, after quoting section 9 of the general Incorporation act, as above set forth, the court proceeds as follows: "By organizing under the general Incorporation act, the defendant in error agreed to submit itself to and to be bound by such regulations and provisions as the legislature should deem it advisable to make. The object of its creation was to furnish water to the city of Danville and the inhabitants thereof. The right of the legislature to regulate and provide for the rates, at which such water should be supplied, was a right reserved by section 9. The language of section 9 is different from, and broader in its scope than, the language contained in many charters, which reserve to the State the power to repeal, alter, amend or modify the charter itself. We apprehend, therefore, that the decisions, restricting the power of the State as to charters which are given subject to the right of the State to repeal, alter, amend or modify them, do not apply to such broad language as is used in section 9. By the terms of section 9, it is something more than the mere right to change the charter of the corporation, which is reserved to the legislature. The authority is thereby reserved to provide the regulations and provisions, under which the corporation may proceed in the transaction of its business." These views were endorsed by the Supreme Court of the United States in the case of *Freeport Water Co*. v. *Freeport City*, 180 U. S. 596, as we understand that decision. In the latter case, the Supreme Court of the United States said in reference to this section 9: "The statute reserves to the General Assembly the power to prescribe in the government of corporations 'such regulations and provisions as it may deem advisable.' The language is very comprehensive. Regarding it alone, it is difficult to conceive what objects of legislation are not covered

by it.   The Supreme Court of the State has construed it
to be of greater import than the usual reservation of the
power to alter and amend the charters of corporations.
The plaintiff, however, contends that it was not intended
by the terms, 'regulations and provisions,' 'to interfere
with the internal business management of the corpora-
tion itself,' but to regulate 'those classes of acts which
control the relation existing between stockholders as
individuals and the corporation as an entirety, and the
relations between corporations and third persons; that
is, the manner of carrying on their business or exercising
the powers of a corporation.'   We think the construction
is too narrow.   The statute made no distinction between
the internal and the external business of corporations,—
between their relations to stockholders and their rela-
tions to third persons.   Such are but special exertions
of the power which the legislature possesses."

When the West Chicago Street Railroad Company
made the lease to the appellant, was appellant to oper-
ate the railroad, so leased to it, in accordance with the
provisions of its own charter, or in accordance with the
provisions of the contract as to the rate of fare, said to
have been made by the lessor companies with the city
of Chicago?   If the appellant was obliged to operate the
leased railways in accordance with the provisions of its
own charter, then section 1723 was a valid ordinance,
and appellant was bound to obey its requirements, as it
was passed under a power delegated to the city by the
legislature as heretofore stated.   Even if such contracts
as are here insisted upon were held and owned by the
lessor companies, appellant could not operate the leased
roads in accordance with the provisions of those con-
tracts, because it was expressly forbidden to do so by
its charter, and by the very terms of its original organi-
zation.   In *Hays* v. *Ottawa, Oswego and Fox River Valley
Railroad Co*. 61 Ill. 422, we said that persons contracting
with a corporation "must be presumed to act with full

knowledge of its powers, and cannot complain when its acts are in accordance with the law of its creation." The West Chicago Street Railroad Company and the North Chicago Street Railroad Company, when they made these leases—if any was made by the latter company—to the appellant, were obliged to take notice of the provisions and requirements of the appellant's charter. .They themselves were organized under the general Incorporation act, and certainly were informed of the provisions of the act, under which they themselves had their own existence. In addition to this, the lease of the West Chicago Street Railroad Company to the appellant which is in the record, shows that the appellant had full knowledge of the provisions of the appellee's charter. Let it be granted that these lessor companies had contracts, which gave them the right to charge a rate of fare up to the sum of five cents for a single passenger, so that the city had no power to reduce the rate without their consent; it is at the same time true that the appellant was obliged under its charter to charge such rate of fare in the operation of the roads leased by it, as the common council, under its power granted by the legislature, should by ordinance prescribe. The lessor companies, by making the leases in question, abandoned their duty to the public. · They gave up the operation of their roads, and entrusted this function to the appellant. The lease of the West Chicago Street Railroad Company to the appellant, as set forth in the statement preceding this opinion, provides that the appellant is to become the absolute owner of the lessor company's railroad property and privileges, so as to leave nothing in such lessor company, except the mere right to exist as a corporation. The general rule is, that a railroad company is a *quasi* public corporation and under peculiar obligations to the public, and that, consequently, it cannot make any contract, which will disable it from performing its public functions. (19 Am. & Eng. Ency. of Law,—1st ed.—pp. 895, 896, and cases in

notes). The lessor companies, by thus submitting their roads to the operation of the appellant, impliedly agreed that the appellant should operate them under its own charter, and in accordance with the provisions of its own charter.

It is true, as a general rule, that, where one railroad company leases its property to another, the lessee must conform to the requirements of the charter of the lessor, and be governed by such charter, in operating the road. But this can only be true where the lessee company, in operating the road in accordance with the charter of the lessor, is not violating its own charter. The cases, announcing this rule, are cases where the lessee road had full power under its charter to operate the road of the lessor in accordance with the terms of the latter's charter, and without conflict with the lessee's charter. In *St. Louis, Vandalia and Terre Haute Railroad Co.* v. *Terre Haute and Indianapolis Railroad Co.* 145 U. S. 393, it was held that the statute of Illinois of February 12, 1855, empowering all railroad corporations incorporated under the laws of the State to make contracts and arrangements with each other, and with railroad corporations of other States, for leasing or running their roads, authorizes a railroad corporation of Illinois to make a lease of its road to a railroad corporation of another State, but confers no power upon a railroad corporation of another State to take such lease if not authorized to do so by the laws of its own State; and it was there said by Mr. Justice Gray, delivering the opinion of the court: "This was, in substance and effect, a lease of the railroad and franchise for a term of almost a thousand years, and was a contract which neither corporation had the lawful power to enter into, unless expressly authorized by the State which created it, and which, if beyond the scope of the lawful powers of either corporation, was unlawful and wholly void, could not be ratified or validated by either or both, and would support no action or suit by either

against the other." The same principle announced in that case is applicable here. The act of February 12, 1855, conferred no power on appellant to take a lease, and operate a leased railroad under the terms of the lessor's charter, if it was not authorized to do so by its own charter. The act of 1855 has reference to the making of contracts and arrangements between railroad companies, already existing and in operation, for the leasing or running of their roads. For instance, one railroad company, whose construction has been completed and whose road is in operation, may make a contract or arrangement with another road for leasing or running that other road. There are some cases, which hold that a railroad, already constructed and required by law to charge a certain rate of fare, may lease and operate another road, and charge the rate of fare prescribed by the charter of the lessor company rather than that prescribed by its own charter. But these cases proceed upon the theory that the lessee road obeys its own charter in operating the part of the road constructed by itself, and operates the road, leased by it in connection with its own road, in accordance with the charter of the lessor road. In the case at bar, however, the appellant, so far as this record shows, never constructed or owned any railroad. The president of appellant testifies that appellant was organized for the express purpose of buying out the north and west side railroads. It does not operate a road, constructed by itself in part, in connection with another road leased by it for the purpose of aiding and helping the operation of its own road. Appellant is a corporation, whose business is the leasing of railroads, and not the operation of a road leased in connection with another road constructed by it. The record shows that it operates no other roads except those leased by it. In its business of leasing, and operating leased railroads, it must comply with its own charter, that is to say, it must submit to reasonable regulations by the common council as to its rate of fare.

Section 9 of the Incorporation act, as above quoted, contains a proviso that the act shall not be held to extend any private charter. If appellant, organized under that act for the purpose of operating leased roads, can operate them in accordance with the charter of the lessor roads it is extending the private charter of the lessor roads, because these lessor roads claim that their contracts were transferred and assigned to them by original roads which were organized under special charters. It is contrary to the provisions of our Incorporation act that private charters should thus be extended through the machinery of that act. Indeed, it is questionable whether appellant was properly organized for the purpose of leasing other railroads and terminating the performance of their duties to the public. Corporations, organized under the general Incorporation act, may be formed in the manner provided by that act for lawful purposes only. If, however, the leasing of other roads exclusively was a lawful purpose of appellant's organization, it certainly was obliged to operate such roads in accordance with the provisions of its own charter, and not in violation thereof.

By the terms of the lease of June 1, 1899, executed by the West Chicago Street Railroad Company to the Chicago Union Traction Company, it is provided that the traction company "shall maintain and effectually operate said railways to the extent that it shall have the lawful right so to do." Thus, by the very terms of the lease in question, the lessor only requires appellant as lessee to operate the leased railways to the extent that appellant shall have the lawful right so to do. Appellant would not have the lawful right to operate these roads in accordance with the contract claimed, rather than in accordance with the provisions of its own charter. When the West Chicago Street Railroad Company authorized the appellant to operate the roads to the extent that it should have the lawful right so to do, it waived its right to insist upon the terms of the contract in question, and

199—35

submitted itself to such terms as were proper under the charter of the appellant, to whom the lease was made.

For the reasons hereinbefore stated, we are of the opinion that, if there were any such contracts as are claimed by appellant, through assignment to it from the companies already mentioned, the enforcement of section 1723 is not a violation of those contracts. The lessor companies must be held to have waived the terms of the contracts when they executed the leases in question to appellant, and appellant is estopped from insisting upon the operation of the roads in strict accordance with the terms of such contracts, because it would thereby be violating the express requirements of its own charter.

Something has been said by counsel for appellant in the argument in regard to the constitutionality of the act of 1865, referred to in the statement preceding this opinion; but as the validity of that act is not necessarily involved in the decision of this case, we decline to pass upon it.

*Third*—If we understand the third point made by the appellant, it is that the ordinance of 1890, re-enacted in 1897, and known as sections 1723 and 1725, applied only to railroads existing at the time of its passage, and therefore could have no application to the appellant, having come into existence afterwards in 1899. We think that section 1723 is clearly prospective in its character. It refers to the "rate of fare to be charged." The words "to be charged" refer to the future, to what is to be charged hereafter. The subsequent part of section 1723, which relates to transfer tickets, refers specially to any line of street railway which "does now or shall hereafter, within the limits of the city of Chicago, join, connect with, cross, intersect or come within a distance of two hundred feet of any other line," etc. These words are certainly prospective in their meaning. The terms of the sections clearly apply to persons or corporations subsequently coming into existence. In *Illinois Central*

*Railroad Co.* v. *Chicago,* 176 U. S. 653, it was held, in an opinion delivered by Mr. Justice Brown, that, under a section of a city charter providing that a railroad corporation should not locate its track within any city without the consent of the common council, such restriction was not limited to the city as bounded at the date of the charter, but applied also to the territory subsequently included within the city limits. In *DeLima* v. *Bidwell,* 182 U. S. 197, it was held by the same learned justice that a statute, prohibiting the sale of liquors to minors, applies not only to minors alive on the day the statute was passed, but to after-born minors.

*Fourth*—There is no evidence in the record tending to show that section 1723 is an unreasonable ordinance. What the earnings of the Union Traction Company are, or have been since its organization, or what the earnings of the West Chicago Street Railroad Company and of the North Chicago Street Railroad Company are, or have been, the testimony in the case does not show. If there was a reduction in the rate of fare, which appellant was entitled to charge, by the requirement as to the giving of transfers, as set out in section 1723, it was incumbent upon the appellant to prove that such reduction has so diminished its profits as to make the requirement unreasonable. It is possible that a reduction of rates might increase the amount of business and earnings of the appellant, instead of decreasing the same. The charge of a lower rate will often increase the number of passengers traveling upon the railroad to such an extent as to make the profits equal, if not superior, to those earned when a higher rate of fare is charged. (*Chicago and Grand Trunk Railway Co.* v. *Wellman,* 143 U. S. 343). In the latter case, the Supreme Court of the United States, speaking through Mr. Justice Brewer, said: "The legislature has power to fix rates and the extent of judicial interference is protection against unreasonable rates." It is only where rates are made so unreasonable, as to make the

enforcement of the law establishing them equivalent to taking property for public use without just compensation, that the Federal courts hold that the corporation has been deprived of its property without due process of law, and has been denied the equal protection of the laws. There being an entire absence of testimony as to the earnings or profits of the appellant, there is nothing in the three cases here under consideration to justify us in holding that there has been any infringement of this provision of the constitution.

The judgments of the criminal court of Cook county in the three cases here considered are affirmed.

*Judgment affirmed.*